IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ILLINOIS TOOL WORKS INC.,      )
                               )
            Plaintiff,         )
                               )
v.                             )
                               )
POLY-AMERICA L.P.,             )
                               )
            Defendant.         )      Civil Action No. 3:18-CV-0443-C

## ORDER

After hearing the testimony, reviewing the exhibits admitted into evidence, and considering the Parties' pre-trial and post-trial briefs, the Court makes the following findings of fact:

**I.**
**FINDINGS OF FACT[1]**

**A.    Poly-America Plans to Enter the Reclosable Plastic Consumer Storage Bag Market Supporting its Standing.**

        *1.    Evidence from the TTAB Trial Record*

1.    Poly-America is a United States company, founded in 1976 and headquartered in Grand Prairie, Texas.  Poly-America's facilities in Grand Prairie house most of its senior executives and approximately 1 million square feet of manufacturing space.  Poly-America also has affiliated entities and divisions located in Mont Belvieu, Texas (the Pol-Tex division of Poly-America), Henderson, Nevada (Poly-West, Inc., a subsidiary of Poly-America), and

---

[1] To the extent any of the Conclusions of Law set forth in Section IV, below, are deemed to be Findings of Fact, they are incorporated herein by reference.

Cottage Grove, MN (Up North Plastics, Inc.). During the TTAB proceedings, Poly-America was in the process of building another facility in Chester, South Carolina (Carolina Poly), which has since opened. The Poly-West, Inc. facility is approximately 400,000 square feet and the Carolina Poly facility is approximately 400,000 square feet. Poly-America and its affiliated entities employ approximately 3,000 people, located in its facilities across the country. DTX-78 at A7784-7786 (Dkt. 29-16; Ross TTAB Tr. Test. at 4:25-6:15).[2] In 2015, the annual sales of Poly-America and its affiliated entities exceeded $1 billion. *Id.* at A7786 (6:5-8).

2.  Poly-America is a manufacturer and supplier of plastic film and bag products, and its products are available throughout the United States and through multiple distribution channels. Among other things, Poly-America currently manufactures garbage bags that primarily are sold through consumer retail outlets such as Sam's Club, Costco, Home Depot, Lowe's, BJ's Wholesale, Meijer, HEB, Aldi, Target, and Walmart. Poly-America sells its garbage bags under both its own name brands and as private-label products (*i.e.*, products commonly referred to as "store brands"). Poly-America's garbage bags compete in the retail marketplace side-by-side with national brands such as GLAD and HEFTY, as well as private-label brands such as GREAT VALUE. DTX-78 at A7784, A7787-7788 (Dkt. 29-16; Ross TTAB Tr. Test. at 4:18-24, 7:18-21, 8:11-14, 8:18-10:8), DTX-103 at A8274-8275 (Dkt. 29-18; Mallory TTAB Tr. Test. at 6:14-7:1).[3]

3.  The plastic trash bag business is closely related to the reclosable food storage bag business on a number of different levels. These products are merchandised in close proximity to

---

[2] Mr. Ross has been the President and CEO of Poly-America since 2006. DTX-78 at A7784, 7786-7787 (Dkt. 29-16; Ross TTAB Tr. Test. at 4:10-13, 6:16-7:1, 7:9-11).

[3] Mr. Mallory has been employed at Poly-America since 1988. He currently is Vice-President of Sales at Poly-America. DTX-103 at A8272-8274 (Dkt. 28-18; Mallory TTAB Tr. Test. at 4:14-6:2).

one another in retail stores. Many of the players that are in the trash bag industry, including the major ones, also are players in the food storage bag industry. The feed stock suppliers of the raw materials used to make trash bags are also the same as those used for the production of plastic food storage bags. There also are commonalities in the manufacturing process. DTX-78 at A7790-7781 (Dkt. 29-16; Ross TTAB Tr. Test. at 10:9-11:2).

4.     From a sales standpoint, individuals responsible for the trash bag category at retailers also are responsible for the food storage bag category. Divisional merchandising managers for retailers that oversee trash bags also oversee food storage bags. DTX-78 at A7791 (Dkt. 29-16; Ross TTAB Tr. Test. at 11:3-8).

5.     Since at least as early as 2010, Poly-America began investigating and planning to add reclosable plastic consumer storage bags to its product line and remains interested in entering that market. DTX-78 at A7791-7792 (Dkt. 29-16; Ross TTAB Tr. Test. at 11:10-13, 12:18-24); DTX-103 at A8275-8283 (Dkt. 29-18; Mallory TTAB Tr. Test. at 7:14-15:3); DTX-79 & DTX-86 (Dkt. 29-16; Poly-America's TTAB Tr. Exs. 2 & 9).

6.     Poly-America desires to enter into the reclosable plastic consumer storage bag market for two primary reasons. First, reclosable plastic consumer storage bags are a natural expansion of Poly-America's existing trash bag business. There are a number of synergies both on a sales level and an operational and purchasing level with regard to the trash bag product line and the reclosable plastic storage bag product line. Second, the addition of reclosable storage bags to its product line will help grow Poly-America's relationships with its retailer customers. Many retailers prefer to source multiple private-label products (such as both garbage bags and consumer storage bags) from a single supplier. Because retailers often purchase product lines collectively, not having a food storage bag offering undermines the ability to sell a retailer trash

bags. It also means a manufacturer is unable to offer retailers bundled or packaged deals that include both trash bags and food storage bags. For example, in 2014, one of Poly-America's major customers, Aldi, reduced its purchase of trash bags from Poly-America because it was able to obtain a bundled deal, with both trash bags and food storage bags, from one of Poly-America's competitors. DTX-78 at A7791-7794 (Dkt. 29-16; Ross TTAB Tr. Test. at 11:14-12:16, 13:22-14:21) & DTX-79 (Dkt. 29-16; Poly-America TTAB Tr. Ex. 2); DTX-103 at A8279-8282 (Dkt. 29-18; Mallory TTAB Tr. Test. at 11:10-14:24).

7.     With respect to Poly-America's competitors in the trash bag business, Poly-America is the only major manufacturer that is not also involved in the food storage bag business. Virtually all of Poly-America's major retail customers, with the exception of home improvement centers, sell both trash bags and reclosable food storage bags. DTX-78 at A7791-7793, A7796 (Dkt. 29-16; Ross TTAB Tr. Test. at 11:22-25, 12:25-13:3, 13:5-20, 16:16-20).

8.     Poly-America's three major competitors in the trash bag business are Clorox (GLAD brand), Reynolds (HEFTY brand and private-label brands), and Inteplast/Minigrip (private-label). DTX-78 at A7793-7796 (Dkt. 29-16; Ross TTAB Tr. Test. at 13:25:1-16:10). According to ITW, each of these three major competitors is licensed under the ITW "Color Line" marks. *See infra* Findings of Fact ("FOF") ¶¶ 42, 45, 47. Each of these three major competitors also sells reclosable food storage bags that include a colored zipper. DTX-78 at A7795-7796 (Dkt. 28-16; Ross TTAB Tr. Test. at 15:22-16:10, 16:16-20).[4]  Poly-America believes that its

---

[4] Mr. Ross also testified that Poly-America considers AEP/Webster Industries another core competitor in the trash bag industry (although less so than Clorox, Reynolds, and Inteplast/Minigrip). DTX-78 at A7795 (Dkt. 29-16; Ross TTAB Tr. Test. at 15:2-9, 15:17-20). Mr. Plourde also testified that AEP/Webster Industries (which is also Chelsea Industries) ended its license with ITW and quit making reclosable bags with colored closures because it "lost a huge portion of their Color Line business" to Inteplast/Minigrip. DTX-105 at A6017-6018 (Dkt. 29-14; Plourde TTAB Tr. Test. at 91:11-19, 92:17-20).

competitors' ability to offer reclosable food storage bags to their retail customers offers these competitors a "meaningful asset" in marketing trash bags to those customers.  DTX-78 at A7796-7797 (Dkt. 29-16; Ross TTAB Tr. Test. at 16:21-17:3).[5]  *See also* DTX-103 at A8281-8282 (Dkt. 29-18; Mallory TTAB Tr. Test. at 13:17-14:4).

9.     Poly-America is ready to enter the reclosable consumer storage bag market using colored closures.  The only remaining impediment to Poly-America's entry into this market is the three ITW trademark registrations.  DTX-78 at A7808-7811, A7823, A7826-7827 (Dkt. 29-16; Ross TTAB Tr. Test. at 28:2-31:15, 43:2-18, 46:17-47:11); DTX-91 at A8153 (Dkt. 29-17; Bertrand. TTAB Tr. Test. at 33:17-23).  Poly-America's readiness and intent to enter the reclosable consumer storage bag market has not changed since the conclusion of the TTAB proceedings.

10.     In preparation for entry into the reclosable food storage bag business, Poly-America has met with and/or had discussions with representatives of numerous retailers who are among Poly-America's current customers and/or potential customers.  Indeed, Poly-America has been, and remains, interested in manufacturing and selling private-label reclosable bags to retailers such as Walmart, Target, Costco, Meijer, BJ's, Sam's Club, and Aldi, among others.  Poly-America has already had discussions on this subject with Walmart, Target, Costco, Meijer, BJ's, Sam's Club, and Aldi. Poly-America's customers have requested Poly-America to supply reclosable plastic consumer storage bags with colored closures in addition to garbage bags to

---

[5] ITW itself has recognized that some retailers prefer to purchase an entire product line from a single supplier.  DTX-24 at A3924 (Dkt. 29-9; Plourde TTAB Depo. at 133:1-10) & DTX-32 at A4029 (Dkt. 29-9; Plourde TTAB Depo. Ex. 12, at ITW0004913 ("Selling 'direct' to large grocery chains will be the greatest challenge due to their current preference to purchase a full product line from one supplier.").  ITW made this admission as it attempted to begin selling private-label reclosable bags with colored closures directly to retailers.  *See* DTX-45 at A4550-4551 (Dkt. 29-10; Stevens TTAB Depo. at 64:8-65:24, discussing Plourde TTAB Depo. Ex. 12).

achieve brand equivalence with national brand reclosable bags such as those offered by Poly-America's competitors and ITW's licensees. Poly-America has every expectation that it will be able to sell reclosable food storage bags to its customers if it enters the market.  DTX-78 at A7797-7800, A7831-7832 (Dkt. 29-16; Ross TTAB Tr. Test. at 17:4-22, 18:12-14, 19:1-22, 20:22-23:5, 51:18-52:2); DTX-103 at A8275-8283 (Dkt. 29-18; Mallory TTAB Tr. Test. at 7:7-15:3).

11.     In preparation for entry into the reclosable food storage bag business, Poly-America also has monitored the marketplace.  DTX-78 at A7806-7807 (Dkt. 29-16; Ross TTAB Tr. Test. at 26:1-27:19) & DTX-80 (Dkt.29-16; Poly-America TTAB Tr. Ex. 3).

12.     Through its discussions with retail chain representatives, and based on its experience in the industry, Poly-America understands that its customers want reclosable consumer storage bags with colored closures in addition to garbage bags.  Retailers want reclosable bags with colored closures to achieve brand equivalence with national brand reclosable bags (such as ZIPLOC and GLAD), including functional features such as colored closures.  The functional advantages of reclosable bags that use colored closures include making it easier for consumers (end-users) to identify the opening of the bag and to determine whether the bag is closed (sealed) or open (unsealed).  For purposes of Poly-America's business model, the market for clear reclosable plastic consumer storage bags (*i.e.*, bags without colored closures) is minimal.  It is typically limited to players that are not major outlets for food storage bags.  Accordingly, Poly-America's ultimate success in the reclosable consumer storage bag market depends upon its ability to provide customers with bags having colored closures.  DTX-78 at A7789, A7799, A7808, A7810, A7833-7835, A7838-7839, A7850, A7861-7863, A7870 (Dkt. 29-16; Ross TTAB Tr. Test. at 9:11-18, 19:1-22, 28:2-17, 30:1-7, 53:8-54:1, 54:8-16, 55:14-19,

58:16-59:15, 70:19-23, 81:20-82:18, 83:8-17, 90:11-24); DTX-103 at A8282-8283, A8290 (Dkt. 29-18; Mallory TTAB Tr. Test. at 14:6-15:3, 22:13-25).

13.     In preparation for entry into the reclosable consumer storage bag business, Poly-America also has purchased necessary manufacturing equipment and produced internal test products.   Poly-America has to date spent more than $3 million in its efforts to enter the reclosable consumer storage bag business. DTX-78 at A7797, A7822, A7868-7869 (Dkt. 29-16; Ross TTAB Tr. Test. at 17:4-17, 42:21-42:13, 88:18-89:13); DTX-91 at A8129-8147. A8149 A (Dkt. 29-17; Bertrand TTAB Tr. Test. at 9:2-27:8, 29:3-6) & DTX-92 to DTX-101 (Dkt. 29-17; Poly-America TTAB Tr. Exs. 11-20, equipment invoices).[6]

14.     The addition of color to the closure profile on reclosable plastic bags adds, at most, a nominal amount to total production costs.   Mr. Bertrand testified that adding color to zipper closures would add only "fractions of a cent" to the cost of manufacturing a reclosable food storage bag without color.[7]   Furthermore, the addition of color does not contribute any

---

[6] Mr. Bertrand is Vice President of Purchasing for Poly-America.  He has over 30 years of experience on the manufacturing side of Poly-America's business.   He handled all the investigation of the equipment, the development of processing techniques and products related to Poly-America's plans for entering the reclosable storage bag market.  DTX-91 at A8124-8127 (Dkt. 29-17; Bertrand TTAB Tr. Test. at 4:17-6:9; 6:24-7:9); DTX-78 at A7722 (Dkt. 29-16; Ross TTAB Tr. Test. at 42:14-20).

[7] In contrast, ITW's witness, Mr. Plourde, was unable to quantify the additional incremental manufacturing cost of producing reclosable plastic bags with colored resin added to zipper closures and had not performed any recent calculations in that regard.

Q. But my question is when you give me a relative cost, are you talking about the cost of just the resin to make the zipper portion or are you talking about the total cost of all materials used to make the plastic bag?

A. Just to make the colored portion.

Q. And how much incremental cost is there to adding the color line, if you will, with respect to the cost of an entire bag?

significant complexity to the manufacturing process. DTX-91 at A8149, A8158-8159 (Dkt. 29-17; Bertrand TTAB Tr. Test. at 29:7-12, 38:1-39:17).

15.    Poly-America also has considered the option of outsourcing, and has met and held discussions with potential suppliers of both finished bag products and product components (such as the zipper flange covered by the '114 Registration and the rollstock covered by the '243 Registration). DTX-78 at A7810-7822, A7829 (Dkt. 29-16; Ross TTAB Tr. Test. at 30:25-42:7, 49:7-24) & DTX-82 to DTX-85 (Dkt. 29-16; Poly-America TTAB Tr. Exs. 5-8); DTX-91 at A8126-8128, A8148-8153, A8170-8171 (Dkt. 2917; Bertrand TTAB Tr. Test. at 6:24-7:9, 8:10-25, 28:19-29:2, 30:18-31:10, 32:5-14, 32:22-33:11, 50:9-51:18).

16.    Poly-America estimates that it would take only about two to three months for it to begin sales of reclosable consumer storage bags after this proceeding is concluded and the ITW Registrations (the final impediment to Poly-America's entry to the market) are cancelled. DTX-78 at A7823 (Dkt. 29-16; Ross TTAB Tr. Test. at 43:3-12); DTX-91 at A8147-8148 (Dkt. 29-17; Bertrand TTAB Tr. Test. at 27:18-28:8; 33:17-23).

---

A. I would have to do the calculations and get the actual cost of materials and amounts of materials.

Q. You haven't done that calculation in preparation for this testimony, correct?

A. No, I have not.

Q. And when was the last time you did that type of a calculation, if you recall?

A. Well over a decade, but I have done that calculation.

Q. A long time ago, correct?

A. Yes.

DTX-105 at A5998-5999 (Dkt. 29-14; Plourde TTAB Tr. Test. 72:25-73:18).

17.     Poly-America is also a prospective purchaser and consumer of flexible plastic reclosable fastener strips and reclosable film tubing and plastic film sheeting for use in the manufacture of reclosable plastic bags.  Accordingly, Poly-America has a real and legitimate interest in ensuring that reclosable bag components are commercially available from multiple sources without concerns that such components are unfairly encumbered by being unable to utilize colored closures without running afoul of ITW's trademarks. DTX-91 at A8148-8153, A8170-8171 (Dkt. 29-17; Bertrand TTAB Tr. Test. at 28:19-33:11, 50:9-51:18); DTX-78 at A7810-7822, A7829 (Dkt. 29-16; Ross TTAB Tr. Test. at 30:25-42:7, 49:7-24).

18.     For all these reasons, the TTAB record establishes that the '120, '114, and '243 Registrations damage, and will continue to damage, Poly-America by unfairly restricting Poly-America's ability (a) to enter into and fairly compete in the market for reclosable plastic bags using colored closures in the United States; (b) to purchase and/or to import components with colored closures for use in the manufacture of reclosable plastic bags; and/or (c) to purchase and/or import reclosable film tubing or plastic film sheeting, not for wrapping, to use in the manufacture of reclosable plastic bags. DTX-78 at A7810, A7816-7816, A7820-7822 (Dkt. 29-16; Ross TTAB Tr. Test. at 30:8-24, 35:15-36:2, 40:13-42:7).

2.     *Trial Evidence*

19.     The evidence presented at trial establishes that Poly-America remains ready, willing, and able to enter the market.

20.     Over a decade ago, major trash bag retail customers began asking Poly-America about supplying brand-equivalent reclosable plastic bags.  Those customers continue to express

interest in purchasing private-label, national brand-equivalent reclosable plastic bags from Poly-America. Day 2 Tr. 98-100, 104-106 (Ross),[8] DTX-245, Day 2 Tr. 153-54, 159-60 (Mallory).

21.     To succeed in the marketplace, Poly-America needs to supply reclosable bags with all of the functional features of the Ziploc bag, including the colored line of the Ziploc bag. Day 2 Tr. 96, 99-100,110 (Ross), 151, 153-54 (Mallory).   That is the single competitively significant application at issue here.

22.     Several years ago, Minigrip/ITW executive Sean Dowd told Michael Ross and Trent Mallory that Poly-America needed to partner with Minigrip because Poly-America could neither import nor manufacture food storage bags that were brand equivalent to Ziploc because of the restrictions of the color line.  Day 2 Tr. 102 (Ross), 156-57 (Mallory).  After hearing Mr. Dowd's views, Poly-America had discussions with ITW about Poly-America acquiring ITW's Minigrip division.  *Id.*, Tr. 103 (Ross).

23.     Ultimately, Poly-America's competitor, Inteplast, acquired the Minigrip division of ITW.  Day 2 Tr. 103 (Ross).

24.     Glad, Reynolds, and Inteplast are Poly-America's major trash bag competitors. Day 2 Tr. 97 (Ross), 152-53 (Mallory).  Each of those major competitors is an ITW licensee, and according to ITW, each also sells reclosable plastic bags with a colored line to Poly-America's major retail customers.  *Id.*  Only Poly-America cannot offer to supply reclosable plastic bags with a colored line to its major trash bag customers.  *Id.*

25.     Poly-America needs to be able to use a colored line on reclosable plastic bags to offer to its major retail customers a product that is brand-equivalent to Ziploc bags.  The three ITW registrations at issue here remain the last barriers to Poly-America's entry into the

---

[8] Trial testimony from September 3, 2019 is referred to as "Day 1 Tr."  Trial Testimony from September 4, 2019 is referred to herein as "Day 2 Tr."

reclosable plastic consumer storage bag market.   Day 2 Tr. 103-104, 109-9 (Ross).   Mr. Ross testified at trial that the barriers presented by the three ITW registrations have not changed since he testified in the TTAB proceedings.  *Id.* at 104.  Thus, the '120, '114, and '243 Registrations still continue to damage, and will continue to damage, Poly-America by unfairly restricting Poly-America's ability (a) to enter into and fairly compete in the market for reclosable plastic bags using colored closures in the United States; (b) to purchase and/or to import components with colored closures for use in the manufacture of reclosable plastic bags; and/or (c) to purchase and/or import reclosable film tubing or plastic film sheeting, not for wrapping, to use in the manufacture of reclosable plastic bags.

26.    Reclosable plastic bags are still a natural extension of Poly-America's trash bag business.  The two products are closely related, with common feed stock suppliers, common customers, shipping to the same distribution centers, common purchasing with, often, even the same buyer, and typically merchandising adjacent one another.  Its major retail customers remain interested in buying private label storage bags with the colored line from Poly-America.  Day 2 Tr., 97-98, 100, 104-6 (Ross).; DTX-245.  Poly-America still has the necessary equipment in place to begin manufacturing reclosable plastic bags as well as the expertise to produce private-label reclosable plastic bags.  Day 2 Tr. 104-107 (Ross), 213-214 (Bertrand).

27.    The Board correctly treated the three challenged ITW trademarks together.  *See* TTAB Decision at 10-11.  The '114 and '243 registrations are component products (zipper strips and rollstock) used to make finished products.  In fact, in 2016, ITW submitted specimens of completed Ziploc bags and packaging for completed Ziploc bags to the USPTO as evidence of the '114 trademark in actual use.  PTX-93, at ITW49642-49645 (Combined Section 8 and 9 declaration and associated specimens).

28.     There is no doubt that, at the very least, Poly-America needs the ability to purchase zipper strips or rollstock to use in manufacturing completed reclosable bags. Day 2 Tr. 226-27, 230-32 (Bertrand).

29.     Poly-America had, and continues to have, standing to challenge the three trademark registrations, and ITW submitted no new evidence to the contrary at trial.

**B.      The Challenged ITW Registrations, and the Goods They Cover**

   *1.     Evidence from the TTAB Trial Record*

30.     The three marks that are the subject of this proceeding are all product design marks.[9]  ITW refers to the three trademarks collectively as its "Color Line Trademark."  DTX-117 at A6252 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW6413, ITW presentation to U.S. Customs and Border Protection).

31.     Flexigrip, Inc. ("Flexigrip"), which later merged into Minigrip, Inc. ("Minigrip"), was the predecessor-in-interest to ITW's rights in the '120, '243, and '114 Registrations.  DTX-37 at A4324, A4333, A4335 (Dkt. 29-10; Ausnit TTAB Depo. at 13:1-22, 28:8-19, 30:9-21). DTX-63 at A4910-4911 (Dkt. 29-11; ITW Responses to Requests for Admission Nos. 91 & 92).

32.     The '120 Registration:  The '120 Registration issued on October 1, 1972.  The '120 Registration describes the claimed mark as a "horizontal stripe adjacent the bag top . . . ."

---

[9] The subject registrations were introduced during Mr. Ross's TTAB trial testimony (Dkt. 29-26) as Poly-America TTAB Tr. Ex. 4 ('120 Registration), Poly-America TTAB Tr. Ex. 5 ('114 Registration), and & Poly-America TTAB Tr. Ex. 7 ('243 Registration).  These exhibits are marked in this case as DTX-81, DTX-82, & DTX-84.  The three registrations also were introduced during Mr. Plourde's TTAB trial testimony (Dkt. 29-14) as ITW TTAB Tr. Ex. 4 ('120 Registration), ITW TTAB Tr. Ex. 6 ('243 Registration) & ITW TTAB Tr. Ex. 8 ('114 Registration).  These exhibits are marked in this case as DTX-106, DTX-107. & DTX-108.  The three registrations are also included in ITW's trial exhibits PTX092, PTX093, and PTX094 (certified file wrappers).

The goods identified in the '120 Registration are "plastic bags" in International Class 16. The mark is depicted in the '120 Registration as follows:



33.    The '243 Registration: The '243 Registration issued on September 11, 1984. The goods identified in the '243 Registration are "reclosable film tubing and plastic film sheeting not for wrapping." The '243 Registration describes the claimed mark as "a continuous colored stripe extending for the length of plastic film tubing and plastic film sheeting having a continuous recloseable strip on the surface."    The mark is depicted in the '243 Registration as follows:



34.    The '114 Registration: The '114 Registration issued on December 28, 1976. The goods identified in the '114 Registration are "flexible plastic reclosable fastener strips."    The '114 Registration lacks a written description of the mark, but portrays it as a line extending horizontally along the length of the fastener strip:

35.     The identification of goods in each of the challenged registrations does not restrict channels of trade or classes of purchasers.

36.     The '120 Registration expressly covers "plastic bags."  Reclosable plastic bag products covered by the '120 Registration were at various times sold by ITW or its licensees in one or both of the industrial and consumer retail markets.  DTX-105 at A5596, A6016, A6018, A6022-6023 (Dkt. 29-14; Plourde TTAB Tr. Test. at 70:16-24, 90:7-25, 92:17-20, 96:21-97:19); *see also* DTX-106 & DTX-117 (Dkt. 29-14; ITW TTAB Tr. Ex. 4 & ITW TTAB Tr. Ex. 28 at ITW6416); DTX-105 at A6027-6028 (Dkt. 29-14; Plourde TTAB Tr. Test. at 101:1-102:20) & DTX-119 at A6295 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW6433); DTX-118 at A6267, A6272 (Dkt. 29-14; ITW TTAB Tr. Ex. 29 at ITW6405 & ITW6410, undated ITW presentation to U.S. Customs and Border Protection)("Our [Color Line] trademark is the primary basis for distinguishing reclosable bags sold for industrial, commercial, food service and medical applications as well as our Zip-Pak® Resealable Zipper Products employed in many consumer food products sold through retail channels.").[10]

37.     Products covered by the '243 Registration are interim products created in order to make a completed plastic bag.  The immediate consumers of these products, *i.e.*, bag manufacturers, use them to create a finished bag that can be sold to either industrial or consumer

---

[10] DTX-119 (Dkt. 29-14; Poly-AmericaTTAB Trial Exhibit 21) was temporarily referred to as "Exhibit A" during Mr. Plourde's TTAB trial testimony and subsequently marked as Poly-America TTAB Trial Exhibit 21. *See* DTX-105 at A6027 (Dkt. 29-14; Plourde TTAB Tr. Test. at 101:1-7).

bag markets. DTX-105 at A5995-5996 (Dkt. 29-14; Plourde TTAB Tr. Test. at 69:20-70:3) & DTX-107 (Dkt. 29-14; ITW TTAB Tr. Ex. 6).   Thus, the products covered by the '243 Registration are a component of finished reclosable bags that are covered by the '120 Registration.

38.   The '114 Registration covers a zipper closure mechanism that is ultimately joined with the top portion of a plastic bag in order to create a reclosable plastic bag.  The immediate consumers, *i.e.*, bag manufacturers, use zipper strips covered by the '114 Registration to create reclosable bags that consumer packaged goods companies fill and then sell to end-user consumers.  DTX-105 at A5996 (Dkt. _29-14; Plourde TTAB Tr. Test. 70:4-15) & DTX-108 (Dkt. 29-14; ITW TTAB Tr. Ex. 8).   Thus, the fastener strips that are covered by the '114 Registration are a component of finished reclosable bags that are covered by the '120 Registration.

39.   Indeed, as shown on the following page specimens ITW submitted to the United States Patent and Trademark Office ("USPTO"), in conjunction with ITW's February 11, 2016 Sections 8 and 9 renewal filing for the '114 Registration, depict reclosable plastic bags with multiple horizontal lines near or on the zipper closure and packaging for ZIPLOC brand reclosable bags.

**'114 Registration:  Specimens Submitted to USPTO by ITW on February 11, 2016**[11]





---

[11] *See* DTX-120 at ITW0049642-ITW0049649 (excerpt from the certified file wrapper of the '114 Registration).  *See also* PTX093 at ITW0049642-ITW0049649.  As already noted, the file wrappers of the three ITW marks as issue were automatically considered a part of the record before the TTAB.  *See* 37 C.F.R. § 2.122; TBMP § 704.03(a).  Thus, they are not "new" evidence for purposes of this Court's review under 15 U.S.C. § 1071.  ITW's exhibits PTX092, PTX093, and PTX094 are the certified copies of the file wrappers for the three registrations.  DTX-120 is an excerpt from the certified file wrapper for the '114 Registration marked as PTX093.

40.     Each of the '120, '243, and '114 Registrations contains the statement that, although the drawing is lined in red, the applicant makes no claim to a specific color or to color. *See* DTX-81 to DTX-83 (Dkt. 29-16; Poly-America's TTAB Tr. Exs. 4, 5, & 7).   ITW contends that its registrations encompass lines on reclosable plastic bags in "every color of the rainbow." ITW also contends that its Registrations cover bags with more than one colored line, bags that use more than one color to mark the closure; and bags using color on both sides (male and female) of the closure profile, including bags that utilize a color-change feature (*i.e.*, more than one color, such as Glad's "yellow and blue makes green" colored zipper closure).   DTX-24 at A3942-3943, A3944, A3946 (Dkt. 29-9; Plourde TTAB Depo. at 157:13-158:12, 171:8-19, 179:12-15, 179:21-25).   This position is consistent with the interpretation of the '120 Registration in *In re First Brands Properties, Inc.*, 2000 TTAB LEXIS 425 at **5-6 (TTAB July 12, 2000) ("The 'mark as shown' is a colored stripe, otherwise it would be virtually invisible. By making no claim to any 'specific color,' **we are of the opinion that registrant intended to encompass all colors** when used in a stripe in this particular location on the goods."). (Emphasis added).   Nor does ITW limit the alleged scope of the three challenged ITW Registrations to colored lines of any specific width.   DTX-105 at A6028-6032 (Dkt. 29-14; Plourde TTAB Tr. Test. 102:12-105:23, discussing DTX-119 (Dkt.29-14; Poly-America TTAB Tr. Ex. 21, aka Ex. A)).

41.     In May of 2002, ITW filed a Letter of Protest with the USPTO, objecting to Glad's application to register as trade dress the "yellow and blue makes green" zipper feature used on its reclosable bags. *See generally* FOF ¶¶ 167-171, *infra*.   In that Letter of Protest, ITW specifically pointed out that "[t]he [Glad] plastic bags in issue have a blue colored stripe on one side (which the application refers to as a translucent blue closure half) and a yellow colored

stripe on the other side (which the application refers to as a translucent yellow closure half) which, **when combined, form a green stripe.**" DTX-61 at A4683 (Dkt. 24-18; Letter of Protest at ITW0024409)(emphasis added); *see also* DTX-72 & DTX-73 (Dkt. 28-11; stipulation regarding attached Letter of Protest and approval by TTAB).   Thus, ITW affirmatively represented to the USPTO that, when sealed, the Glad zipper closure formed a colored stripe of a **single** color (green).   Although ITW argues that its marks do not cover a "color change feature," ITW has carefully avoided any representations concerning the line of a single color that is formed when bags using a color change feature are sealed.   ITW has never represented that its marks do not cover the single colored line created when zippers that incorporate a color-change feature, like the Glad zipper, are sealed.

42.    ITW has used reclosable plastic bag products produced by its licensees as examples of products covered by the '120, '243, and '114 Registrations in submissions made to the U.S. Customs and Border Protection Department.   In an October 18, 2012 submission, for example, ITW described "Products bearing the Color Line Trademark" as "reclosable plastic bags bearing a colored, horizontal fastener strip near the top of the bags" as well as "[c]olored reclosable strips and tubing."   DTX-105 at A6027-6032 (Dkt.29-14; Plourde TTAB Tr. Test. at 101:1-106:23) & DTX-119 at A6296-6298 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW6434-36).   "Genuine" licensed products identified in this submission include products by (1) S.C. Johnson & Sons, Inc. ("S.C. Johnson") - all bags bearing the ZIPLOC brand; (2) The Clorox Company - all bags bearing the GLAD brand;[12] (3) Presto Products (Reynolds Corp.) ("Presto/Reynolds"); (4) AEP Industries/Webster Industries ("AEP/Webster"); (5) Trinity Packaging Corp. ("Trinity Packaging"); (6) Minigrip LLC ("Minigrip"); and (7) Inteplast Group,

---

[12] The Glad Products Company ("Glad") operates as a division of The Clorox Company.   DTX-24 at A3917 (Dkt. 29-9; Plourde TTAB Depo. at 90:5-7).

Ltd. ("Inteplast") DTX-119 at A6295 (Poly-America TTAB Tr. Ex. 21 at ITW6433). Examples of "genuine" products depicted in this submission include reclosable plastic bags bearing multiple horizontal colored lines near the top of the bag and reclosable bags bearing colored lines on both sides (*i.e.*, male and female) of the closure profile. DTX-105 at A6028-6032 (Dkt. 29-14; Plourde TTAB Tr. Test. at 102:6-106:23) & DTX-119 at A96-6298 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW6434-36). As Mr. Plourde testified, for example, licensed ZIPLOC brand bags typically have color on both sides of the bag, and licensed GLAD brand bags have always had color on both sides of the bag. DTX-105 at A6021 (Dkt. 29-14; Plourde TTAB Tr. Test. at 106:11-23).

43.    In similar fashion, a March 14, 2012 ITW submission to the U.S. Customs and Border Protection Department similarly identifies U.S. licensees of ITW's Color Line Trademark as (1) S.C. Johnson (ZIPLOC brand bags); (2) The Clorox Company (GLAD brand bags); (3) Presto/Reynolds, (4) AEP/Webster, and (5) Trinity Packaging. DTX-117 at A6255 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW6416).[13] This submission also depicts examples of licensed bags, including both ZIPLOC and GLAD Brand bags. DTX-105 at A6021 (Dkt. 29-14; Plourde TTAB Tr. Test. at 97:20-100:16) & DTX-117 at A6259-6250, A6263 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW6420-21, 6423.

44.    ITW's license(s) with AEP/Webster Industries ended in 2014. ITW's license with Trinity Packaging terminated in 2013, when ITW's licensee, Inteplast, purchased Trinity. DTX-105 at A6013-6015, A6018, A6023 (Dkt. 29-14; Plourde TTAB Tr. Test. at 87:25-89:24, 92:6-20, 97:15-19.) Bagco, another former ITW licensee, was acquired by ITW. *Id.* at A6012-

---

[13] Webster Industries is a d/b/a of Chelsea Industries. Mr. Plourde testified that "AEP and Chelsea and Webster were all kind of the same entities." DTX-105 at A6018 (Dkt. 29-14; Plourde TTAB Tr. Test. at 92:19-20) & DTX-113 (Dkt. 29-14; ITW TTAB Tr. Ex. 18).

6013 (Dkt. 29-14; Plourde Tr. Test at 86:13-87:8).

45.     None of the licensed products or their packaging reference ITW's alleged "Color Line" marks or ITW.  National brands such as ZIPLOC, GLAD, and HEFTY are sold under those brand names.  The brand name that appears on the packaging for private-label brands is that chosen by the store selling them. DTX-105 at A6030-6033, (Dkt. 29-14; Plourde TTAB Tr. Test. at 104:6-106:5, 107:9-25); *see also* DTX-45 at A4522, A4527, A4531-4534 (Dkt. 29-10; Stevens TTAB Depo. at 20:1-25, 25:7-23, 33:25-35:25); DTX-24 at A3948-3949 (Dkt. 29-9; Plourde TTAB Depo. at 186:15-187:14) & DTX-34 & DTX-35 (Dkt. 29-9; Plourde TTAB Depo. Exs. 29-30); DTX-59 at A4716-4717, A4724-4725 (Dkt. 28-14; prosecution history for Glad Trademark Reg. No.2,818,766 at POLY7606-07, 7614-15) & DTX-60 at A4800, A4805-4807, A4825-A4834 (Dkt. 28-14; excerpts from prosecution history for Glad Trademark Reg. No. 1,592,945 at POLY7731, 7738-40, 7765-84), DTX-41 at A4446-4447, A4456-4459 (Dkt. 29-10; Kohl TTAB Depo. at 41:12-42:4, 66:17-69:17). *See also* DTX-63 at A913-4914 (Dkt. 29-11; ITW Responses to Requests for Admission Nos. 106-110).

46.     Over the years, ITW has taken the position that the manufacture and sale of reclosable consumer storage bags with a color line along the zipper closure of consumer storage bags infringes the '120, '243, and '114 Registrations. *See, e.g.,* DTX-48 at A4605 (Dkt. 28-14; Complaint in *ITW v. Alcoa, Inc.* at ¶¶ 16-18); *see also* DTX-47 at A4571 (Dkt. 28-14; ITW2191).  Alcoa's successor, Reynolds, is now one of ITW's licensees and manufactures HEFTY-brand reclosable bags and private-label reclosable plastic bags, both of which are ultimately sold to end-user consumers. DTX-105 at A6010-6011, A6016 (Dkt. 29-14; Plourde TTAB Tr. Test. at 84:11-20; 85:4-9; 90:14-18); DTX-114 (Dkt. 29-14; ITW TTAB Tr. Ex. 20, ITW-Alcoa license).  ITW's license agreement with Bagco states that the '120, '114, *and* '243

Registrations "are associated with a color line across the top of a reclosable bag." DTX-41 at A4440-4442 (Dkt. 29-10; Kohl TTAB Depo. at 28:17-30:8) & DTX-44 (Dkt. 29-10; Kohl TTAB Depo. Ex. 4, Bagco License, at ITW5192, p.2, ¶¶ 1, 8).

47.     Thus, ITW "licenses" the three challenged registrations to the major market players selling branded and private-label reclosable plastic bags, many of which are ultimately sold to retail consumers.  ITW's current "licensees" include SC Johnson, maker of the market leader ZIPLOC brand; Inteplast, manufacturer of private-label bags; and Reynolds (previously or also known as Alcoa and Presto), which *inter alia* manufacture and/or sell reclosable HEFTY brand plastic bags (through its Pactiv division) and private-label reclosable plastic bags (through its Presto division).  Previous licensees have included Webster/AEP Industries, manufacturer of private-label bags; Trinity Packaging, manufacturer of private-label bags; Bagco; and Dow Chemical (Dow was a predecessor to S.C. Johnson).  *See supra* FOF ¶¶42-45; *see also* DTX-109 to DTX-116 (Dkt. 29-14; ITW TTAB Tr. Exs. 12, 13, 16, 17, 18, 20, 22, & 24, licenses); *see also* DTX-78 at A7846 (Dkt. 29-16; Ross TTAB Tr. Test. at 66:12-23).

48.     ITW also contends that Glad, another leading manufacturer of national brand reclosable consumer storage bags sold under the GLAD brand, is an ITW licensee.  DTX-105 at A6031 (Dkt. 29-14; Plourde TTAB Tr. Test. at 105:12-25) & DTX-119 at A6295, A6298 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW6433 & ITW6436); *see also* DTX-117 at A6255, A6260 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW6416 & ITW6421).  This so-called "license" is a Settlement Agreement that resolved a trademark dispute between Glad and ITW.  *See supra* DTX-112 (Dkt. 29-14; ITW TTAB Tr. Ex. 17, Glad Settlement Agreement); *see also infra* FOF ¶¶ 165-176 (discussing actual terms of agreement).

2.   *Judicial Admissions and Trial Evidence*

49.   None of the registrations use the adjective "thin."  Dkt. 92, Joint Pretrial Order, Stipulations 6, 8, 10.

50.   In its ITW's First Amended Complaint (Dkt. 20-1), ITW admitted that "[t]o this day, Ziploc incorporates the Color Line mark", *id.* ¶ 13, and "the Color Line Trademark Registrations do not require the colored line to appear on the flange or the seal, rather the line could appear on one, the other, or both." Id., ¶ 22. (Dkt. 20-1). Those are judicial admissions that conclusively bind ITW. *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983)("judicial admissions are conclusively binding on the party who made them"); *Continental Insurance Co. v. Coates & Dorsey, Inc.*, 439 F.2d 1294,1298 (5th Cir. 1971)("As a general rule the pleadings of a party made in another action, as well as pleadings in the same action which have been superseded by amendment, withdrawn or dismissed, are admissible as admissions of the pleading party ….").

51.   ITW swore to the USPTO that two specimens submitted in connection with the '114 registration "show[] the mark as used in commerce PTX-93, ITW0049644; Day 2 Tr. 83-84, 145-46. Neither specimen ITW submitted bears only a single, thin colored line on the zipper strip, and the specimen pictured on the right is a Ziploc bag. PTX-93, ITW0049647. ITW did nothing to disclaim any portion of the Ziploc bag's horizontal color "adjacent the bag top."

52.   When ITW sued Alcoa in 2004, it asserted that by having a "colored profile" on consumer storage bags, Alcoa "was an unauthorized user of a 'Color Line' mark."  DTX-47, ¶¶ 19, 30.   This also is a judicial admission conclusively binding on ITW.

53.   ITW is barred by its judicial admissions from asserting the scope of the three challenged registrations is limited to "a thin horizontal line."

54.     ITW's current effort to limit the scope of the three challenged registrations is also contradicted by the evidence of record.

55.     ITW represented to U.S. Customs in a 2012 Product Identification Training Guide that "[p]roducts bearing the Color Line trademark consist of reclosable plastic bags bearing a colored, horizontal fastener strip near the top of the bags." *See* FOF ¶ 43; Day 1 Tr. 186 (Plourde). ITW did not use the adjective "thin" in the registrations. Dkt. 92, Joint Pretrial Order, Stipulations 6, 8, 10.   ITW did not use the adjective "thin" to describe its "Color Line" trademark in its presentations to U.S. Customs.  Moreover, the image of the Ziploc bag ITW included in that presentation shows a "wide color line." *See* DTX-105 at A6028-6032 (Dkt. 29-14; Plourde TTAB Tr. Test. 102:12-105:23, discussing DTX-119 (Dkt.29-14; Poly-America TTAB Tr. Ex. 21, aka Ex. A at ITW6434).

56.     At trial, Mr. Plourde confirmed his 30(b)(6) TTAB testimony about ITW's position on the scope of the registrations.  Day 1 Tr. 188-90. *See also* DTX-24 at A3942-3943, A3944, A3946 (Dkt. 29-9; Plourde TTAB Depo. at 157:13-158:12, 171:8-19, 179:12-15, 179:21-25).  This includes bags with more than one colored line, bags that use more than one color to mark the closure, and bags using color on both sides of the color closure. *Id.*

57.     During the TTAB proceedings, Mr. Plourde also testified that SC Johnson and Glad made Ziploc and Glad "Color Line products."  DTX-105 (Dkt. 29-14, Plourde TTAB Tr. Test. at 90).

58.     Glad makes bags with a blue closure half and a yellow closure half which, when joined to close, form a green-colored stripe.  Day 2 Tr. 125 (Dauber). *See also* FOF ¶¶ 41, 171 (discussing DTX-61 & 72, ITW Letter of Protest).

59.     The proper scope the registrations, which ITW treats as one, is informed by all items that ITW has in the past represented depict and/or bear the mark.

**C.      Patents That Evidence the *De Jure* Functionality of the ITW Registrations**

*1.      ITW's '434 Patent Disclosed and Claimed a Colored Horizontal Strip on the Zipper Flange*

a.      Evidence from the TTAB Trial Record

60.     ITW's predecessor Flexigrip was founded in 1951. Steven Ausnit was a founder of Flexigrip. DTX-37 at A4324, A4333, A4335 (Dkt. 29-10; Ausnit TTAB Depo. at 13:1-22, 28:8-19, 30:9-21); DTX-63 at A4909 (Dkt. 29-11; ITW Response to Request for Admission 74).

61.     On May 2, 1960, Mr. Ausnit filed Patent Application No. 25,945. It eventually issued as U.S. Patent No. 3,054,434 (the "'434 patent"), on September 18, 1962. DTX-37 at A4339-4342 (Dkt. 29-10; Ausnit TTAB Depo. at 35:23-38:10, identifying and discussing DTX-33 (Dkt. 29-9; Plourde TTAB Depo. Ex.13, '434 patent)); *see also* DTX-24 at A3925-3927 (Dkt. 29-9; Plourde TTAB Depo. 135:13-137:18) & DTX-33 (Dkt. 29-9; Plourde TTAB Depo. Ex. 13). Poly-America asks the Court to take judicial notice that the '434 patent expired in 1979.[14]

62.     ITW's predecessors, Flexigrip, and then Minigrip, owned the '434 patent, entitled "Bag Closure." DTX-37 at A4340 (Dkt. 29-10; Ausnit TTAB Depo. at 36:4-12). *See also id.* at A4346-4348 (Dkt. 29-10; Ausnit TTAB Depo. at 42:8-44:19) & DTX-39 at A4415 (Dkt. 29-10; Ausnit TTAB Depo. Ex. 7 at ITW126, Flexigrip brochure noting '434 patent).

63.     Independent claim 6 (col. 6:29-46) of the '434 patent (DTX-33) reads as follows (emphasis added):

---

[14] DTX-4, A3490-3495 (Dkt. 28-12) is also a copy of the '434 patent, which ITW has admitted is a true and correct copy. *See* DTX-3 at A3475 (Dkt. 28-12; ITW response to Request for Admission No. 1). DTX-33, A4054-4059 (Dkt. 29-9; Plourde TTAB Depo. Ex. 13) is a Bates-numbered copy of the same patent that was marked as an exhibit and used in the Plourde and Ausnit depositions.

6. A flexible closure comprising a pair of flexible closure strips each having a web portion and a marginal portion integral therewith, the marginal portions having interlocking rib and groove elements extending therealong and forming a lock between the marginal portions when engaged, one of the marginal portions being alongside its associated web portion and joined thereto by a portion extending laterally between said one marginal portion and its associated web portion and being integral therewith formed of one piece with said one marginal portion and associated web portion, said lateral portion being above the longitudinal centerline of the marginal portions when engaged, and a separating flange on the marginal portion of at least one of said strips for separating the strips and the rib and groove elements and disengaging the lock, **said flange being colored differently than the strips to facilitate identification of the flange and assist in separation of the strip**.

64.     In discussing Figure 5 (depicting a press-to-close type zipper closure), the '434 patent specification touts the utilitarian advantage of the claimed differently colored flange:

> In **order to facilitate identification of the flanges** as means to assist in the separation of the strips 9', 9' when they are engaged together, **the flanges may be colored differently than the strips themselves**. Excellent results may be obtained where the strips 9', 9' are of a clear color while one or both of the flanges 40, 41 are of a red color.

*Id.* ('434 patent, col. 4:64-70) (emphasis added). The specification further proclaims:

> As noted above one or both of the flanges 40, 41 are **preferably** colored a color different than the strips 9', 9' **to facilitate identification of the flanges as means to assist in the separation of the strips**.

*Id.* ('434 patent, col. 5:13-15)(emphasis added).

65.     During his deposition, Mr. Ausnit testified that claim 6 of the '434 patent covered a color line on the lip of a fastener. DTX-37 at A4357 (Dkt. 29-10; Ausnit TTAB Depo. at 70:21-24).

66.     During prosecution of the '434 patent, the Examiner rejected ITW's application claim 19 (an earlier version of the claim that issued as claim 6), stating that: "Coloring an element to be grasped is obviously a matter of design." DTX-37 at A4342-4343 (Dkt. 29-10; Ausnit TTAB Depo. at 38:16-39:12) & DTX-38 at A4381 (Dkt. 29-10; Ausnit TTAB Depo. Ex.

6 at POLY7535).[15]  ITW disagreed, arguing: "Claim 19 includes these features and requires a flange member being colored differently than the color of the marginal portion.  Claim 20 requires flange members with one of the flange members being colored.  The Examiner contends that this is a matter of design or skill, but it is not shown by the prior art, **affords an advantage**, and cannot be regarded to be obvious without a basis in the prior art."  DTX-38 at A4392 (Dkt. 29-10; Ausnit TTAB Depo. Ex. 6 at POLY7546)(emphasis added).

67.    The Examiner again rejected ITW's argument.  DTX-38. at A4395 (Dkt. 29-10; Ausnit TTAB Depo, Ex. 6 at POLY7549).  However, after ITW reargued that the claim was allowable **because of the color element**, the Examiner allowed what became claim 6 of the '434 patent.  *Id.* at A4407-4408 (Dkt. 29-10; POLY7561, 7564).

68.    Minigrip, as the successor to Flexigrip, allegedly started using flexible plastic reclosable fastener strips with a horizontal colored line on plastic bags at least as early as March 26, 1959.  *See* DTX-26 (Dkt. 29-9; Plourde TTAB Depo. Ex. 3, '120 Registration, alleging first use date of March 26, 1959).  The application that resulted in the '434 patent was filed on May 2, 1960.  Minigrip, however, did not apply for the '120 Registration until October 1970. *Id.*

69.    The '120, '114, and '243 Registrations all cover products using the same color element recited in with expired claim 6 of the '434 patent.  All three registrations cover *inter alia* a colored line or lines on a flange attached to the zipper strip, as well as anywhere near the top (*i.e.*, the opening) of a reclosable bag.  DTX-24 at A3942-3942, A3944, A3946 (Dkt. 29-9; Plourde TTAB Depo. at 157:17-158:12, 171:4-19, 179:12-25); *see also* DTX-37 at A4346-4348 (Dkt. 29-10; Ausnit TTAB Depo. 42:8-44:19) & DTX-39 at A4411 (Dkt. 29-10; Ausnit TTAB

---

[15] Only excerpts from Ausnit TTAB Depo. Ex. 6 (prosecution history of the '434 patent) that were cited in Poly-America's TTAB Trial Brief and submitted by Notice of Reliance are included in DTX-38.

Depo. Ex. 7 at ITW0122, Flexigrip brochure: "FLEXTITE's color flange is a trademark of Flexigrip.").

70.     The TTAB determination that Mr. Ausnit's efforts to explain away the '434 patent based on an alleged change of understanding were not credible is supported by substantial evidence. *See* TTAB Decision at 22.   (ITW's "predecessors having availed themselves of the protection of the '434 patent until its expiration, [ITW's] convenient change of heart falls far short of convincing us that the features described in the sixth claim were never functional and may now be the subject of trademark protection." *See also id.* ("Thus, Mr. Ausnit's current testimony that the color line served no function is belied by the actions and statements of Respondent's predecessors, one of which (Flexigrip) he co-founded and for another of which (Minigrip) he served as President and CEO.   Nor does Mr. Ausnit's testimony regarding the asserted difficulties experienced by consumers in opening reclosable plastic bags featuring the colored flange when they were first introduced change the fact that the color line feature was intended to serve and did serve to 'immediately identify the point of [the bags'] opening.").   This is the sort of improper mulligan the patent law eschews.   It is even more inappropriate here because it is being used for the purpose of extending ITW's now-expired patent monopoly potentially in perpetuity.

b.     Trial Evidence

71.     Mr. Ausnit is not a credible witness.

72.     At trial, Mr. Ausnit testified at length about the prosecution history of the '434 patent, his view of the "central" advantage of the '434 patent, and that the "color feature" element in Claim 6 was not a major aspect of the patent. Day 1 Tr. 108-23.

73.     Mr. Ausnit's testimony about the 1960-1962 prosecution history of the '434 patent is not credible. Mr. Ausnit conceded on cross-examination that his direct testimony about

the prosecution history came "to [the] most extent" from his discussions with ITW counsel within the past year. Day 1 Tr. 125. His 2019 testimony is not a credible recollection based on personal knowledge by this witness. *Id.*, Tr. 121-3. Mr. Ausnit had not even seen the prosecution history of the '434 patent when he testified in 2015. *Id.*, Tr. 125. Mr. Ausnit did not recall the '434 patent when he signed a declaration for ITW in 2014. DTX-37 at A4339-4346, A4355-4357 (Dkt. 29-10; Ausnit TTAB Depo. at 35-42, 68-70).

74.     Mr. Ausnit's attempts at trial to denigrate the significance of the functional role of the colored line are not credible. Day 1 Tr. 117-118. On cross-examination, Mr. Ausnit conceded that claim 6 of the '434 patent identified two functional benefits of color on the flange and that the Flexigrip marketing brochure promoted the colored flange as both the trademark and as performing one of these functions – identifying the point of opening. *Id.*, Tr. 132. *See also* FOF ¶ 105; DTX-39 at A4410-4415 (Dkt. 29-10; Ausnit TTAB Depo. Ex. 7 at, Flexigrip brochure) ("Flextite's **color flange is a trademark** of Flexigrip. **It also serves a practical purpose**. It immediately identifies the point of opening.") (emphasis added).

75.     The colored flange of the '434 patent is the horizontal stripe claimed in the three challenged ITW registrations. ITW distributed the brochure that is DTX-39 at least as recently as 1976. PTX-93 at ITW49585-49586; *see also* DTX-49 at A4646-4654 (Dkt. 28-14; same). That brochure lists the '434 patent as one of ITW's patents, putting others on notice not to copy the claimed subject matter. *Id.*; Day 2 Tr. 132 (Dauber).

76.     At trial, Mr. Ausnit conceded he had sent the Flexigrip marketing brochure, DTX-39, to trademark counsel. Day 1 Tr. 129. Yet, he could not recall if he knew either that his attorney had in 1976 (1) submitted that brochure to the trademark Examiner or (2) represented to

the trademark Examiner that the brochure was still being used by his company. *Id.*, 127-28; PTX-93, at ITW49585-49586, 49605-49619 (office action response and associated brochure).

77.     During cross-examination, Mr. Ausnit initially denied that "claim 6 is directed to a color line on the lip of a fastener." Day 1 Tr. 130.  However, when forced to confront his 2015 testimony Mr. Ausnit conceded he previously had testified that claim 6, in fact, was "directed to a color line on the lip of a fastener." Id., Tr. 130-31.  The most reasonable inference from his explanation at trial about being "mistaken," id., Tr. 131, is that he was merely parroting ITW's 2019 theory, rather than offering testimony based on personal knowledge.  His 2015 testimony is consistent with Flexigrip's marketing brochure, DTX-39, and its flyer, DTX-40.

78.     Mr. Ausnit's attack on the TTAB Decision as including a "misrepresentation" is without merit.  *Id.*, Tr. 120-21.  The TTAB Decision stated that Figure 1 of the '434 patent is "remarkably similar to the color line registrations."  Mr. Ausnit's rationale for disparaging the TTAB on this point is that Figure 1 has slider 25, while claim 6 does not have a slider.  *Id.*  Yet, the TTAB Decision clearly states: "It is obvious that Figure 1 of the patent drawing showing the bag (7) and fastener structure (8) is remarkably similar to Respondent's three registrations, albeit with the slider (25) type of pouch rather than the sliderless type described in claim 6 ...." TTAB Decision at 19-20 (side-by-side comparison) (emphasis added).  Further, the '434 patent concedes "the pouch 7' [of Figure 5] is identical to the pouch 7 [of Figure 1] except that this is a sliderless type of pouch."  *Id.*, (quoting '434 patent at 4:51-54).

79.     The TTAB doubted Mr. Ausnit's credibility (TTAB Decision at 22, 24-25) and his performance at trial confirms his lack of credibility.  The real reason for Mr. Ausnit's "convenient change of heart" (TTAB Decision at 22) was best stated in his 2013 speech to a Marquette University audience.  As he admitted at trial, in that speech he proclaimed "that a

trademark can be more valuable than a patent because it lasts forever as long as you renew it every 20 years." Day 1 Tr. 130. Mr. Ausnit's claim that he erred in recognizing the functional role of color, id. Tr. 117-18, is inconsistent with the plain language of the '434 patent specification and claim 6, the applicants' statements during prosecution of the '434 patent, Flexigrip's contemporaneous marketing efforts, and ITW's 2000 business-driven focus study and follow-up activity. See FOF ¶¶ 60-70, 104-107, 117-119. Further, his characterization of the "guts" of the patent is not truly new evidence. In its decision, the TTAB acknowledged that the stated object of the '434 patent is to provide a resilient fastener for a bag or pouch specifically intended to reduce the risk of accidental separation of the fastener when the bag or pouch is filled. It quoted from column 1, lines 20-23 and lines 29-41 of the '434 Patent. TTAB Decision at 15-16.

80.    Although he agreed that the Court should consider all relevant evidence in making its decision, Day 2 Tr. 86), Professor Samuels credited Mr. Ausnit's trial testimony, but the Professor's testimony did not take into account Mr. Ausnit's prior TTAB testimony about the '434 patent and claim 6, or the actual language of claim 6 and the representations made by the applicants during the prosecution of the '434 patent.    He also conceded that there was no evidence that ITW's predecessors ever brought the '434 patent and specifically claim 6 to the attention of the examiners responsible for examining the three challenged ITW trademarks. Id. Tr. 81-82. Professor Samuels' efforts to inject himself into the Court's role of deciding what evidence is relevant and the weight to accord to evidence is inappropriate. That is also true for his efforts to bootstrap the testimony of Mr. Poret and Mr. Plourde.

81.    This proceeding is not limited only to current facts and circumstances and, consistent with the Supreme Court's admonition in *TrafFix Devices, Inc. v. Mktg. Displays, Inc*,

532 U.S. 23 (2001), must take into account the '434 patent, which both disclosed and claimed the functional benefits of color on the flange.   Even ITW's expert, Professor Samuels, acknowledged: "There is case law to say that if what is the subject matter of a utility patent is the subject of the registered mark that that is vital – of vital significance to the question of functionality, is a key issue – to consider."   Day 2 Tr. at 85.   This, of course, is the very same principle the Supreme Court recognized in *TrafFix*.   *See* 532 U.S. at 28 ("A prior patent . . . has vital significance in resolving the trade dress claim.").

82.    Here, because disclosure and/or claim 6 of the '434 patent is the basis for functionality, the critical facts are not subject to change.   Functionality should not and has not changed simply because the patent expired in 1979, while ITW began seeking federal trademark protection prior to its expiry.   The '120 Registration issued in 1972.

83.    The patent and the prosecution history are part of the public record and speak for themselves.   ITW cannot contradict the public record, upon which competitors are entitled to rely.

2.    *Third-Party Patents Claim and/or Disclose Functional Color Lines in Zipper Closures*

a.    Evidence from the TTAB Trial Record

84.    Numerous third-party patents also claim and/or recognize and disclose the utilitarian function and advantages of using color in closures for reclosable plastic bags and other zipper-type closures, including closures that use color-change features or other multi-colored elements.

85.    U.S. Patent No. 4,186,786 (the "'786 patent"):   The '786 patent (DTX-5) [16] is

---

[16] DTX-5, A3496-3500 (Dkt. 28-12, NR1 Tab C).   References to "NR1" and "NR2" in this section are to Poly-America's First and Second Notices of Reliance (DTX-2 & DTX-16), filed in

entitled "Colored Interlocking Closure Strips for a Container" and issued February 5, 1980. The original assignee was Union Carbide Corporation, the originator of Glad's "yellow and blue makes green" zipper closure. *See infra* FOF 163, 168. The specification of the '786 patent states:

> The use of different colors for the interlocking closure is advantageous for both a sliderless closure device as well as a closure device having a slider. The use of different colors for the closure profiles is advantageous for a sliderless interlocking closure device because of the absence of a slider to provide a mechanical indication of the opening of the container. The use of different colors for the closure profiles is particularly advantageous for both the slidered closure device and the sliderless closure device because, as shall be seen more clearly hereinafter, the **use of the colored closure profiles provides means for easy visual verification of complete occlusion** of the closure profiles when interlocking the closure device.

DTX-5 ('786 patent, col. 2:23-36) (emphasis added). Claims 1 & 2 of the '786 patent expressly recite this utilitarian advantage. *Id.*, col. 4.

86.   U.S. Patent No. 4,285,105 (the "'105 patent"): The '105 patent (DTX-6) is a divisional to the application that resulted in the '786 patent (DTX-5)[17] and shares the same specification. Claims 1, 5, and 6 of the '105 patent expressly recite the utilitarian advantage of the claimed color closure. *Id.* ('105 patent, col. 4).

87.   U.S. Patent No. 4,372,014 (the "'014 patent"): The '014 patent (DTX-7)[18] is entitled "Construction System and Fastener Therefore" and is directed at systems and fasteners for assembling preconstructed panels. *Id.* ('014 Patent, Abstract). The '014 patent issued on February 8, 1983. The original assignee of the patent was Star Manufacturing Corporation. In the specification, the patent discloses the utilitarian advantage of using a color in a stripe to

---

the TTAB proceedings.   The "Tab" identified is the Tab that correlates with each patent identified in and submitted with the Notices of Reliance.

[17] DTX-6, A3501-3507 (Dkt. 28-12, NR1 Tab D).

[18] DTX-7, A3508-3523 (Dkt. 28-12, NR1 Tab E).

ensure that connecting flaps of a fastener are engaged:

> With the use of zippers such as described, it is also possible that they can be improperly engaged by inserting a rib member in the wrong groove and this condition go unnoticed during visual inspection. Thus, in another embodiment of this invention, an elongated color stripe can also be provided along the length of that portion of any rib member that may be exposed when the ribs and grooves are improperly engaged as described. In this way, even if the color stripe along the edge of the fastener is covered, the second color stripe will be visible during inspection.

*Id.* ('014 patent, col. 4:26-36).   Claims 2-4 expressly recite this utilitarian color strip element.

*Id.*, (col. 13).

88.   <u>U.S. Patent No. 4,829,641 (the "'641 patent")</u>:   The '641 patent (DTX-8)[19] is entitled "Enhanced Color Change Interlocking Closure Strip"   The '641 patent issued on May 16, 1989.   The original assignee of the patent was First Brands Corp., a successor of Union Carbide's GLAD brand business.   The specification discloses that the '786 and '105 Patents (*see supra* FOF ¶¶ 85-86) provide a solution to the problem of determining when a bag is closed. *Id.* ('641 Patent, col 1:30-50).   The specification states that the "instant invention is advantageous in that the color change in the color change closure is improved . . . by including a color change enhancement member in the internal channel of the male and/or female closure member." *Id.* (col. 2:58-65).   Claim 1 expressly recites this functional advantage: "An interlocking closure device including male and female closure elements arranged to be interlocked over a predetermined length, **each of said closure elements having different colors for establishing visually the completeness of the occlusion . . . .**" *Id.* (col. 16)(emphasis added). *See also id.* (cols.17-19, claims 9, 20 & 27).

---

[19] DTX-8, A3524-3549 (Dkt. 28-12, NR1 Tab F).

89.    U.S. Patent No. 5,070,584 (the "'584 patent"):   The '584 patent (DTX-9)[20] is entitled "Zipper for a Reclosable Thermoplastic Bag and a Process and Apparatus for Making." The '584 patent issued on December 10, 1991.  The original assignee of the patent was Dow Brands, Inc., which preceded S.C. Johnson as the owner of ZIPLOC brand.  The specification discloses that the '786 and '105 patents provided solutions to the problem of determining when a bag is closed, DTX-9 ('584 Patent, col. 1:25-30), although it also identified one disadvantage, *i.e.*, that a color change **may** occur when opposing zipper profiles are brought into overlapping proximity, but not interlocked.  The '584 patent improved upon the colored closure by adding a non-visual component, *i.e.*, a clicking sound, to **further** verify the closing of a zipper for a reclosable bag.  *Id.* (col. 1).  Dependent claims 13, 14, 23, and 24 nevertheless expressly recite color elements in addition to the audible sound element.  *Id.* (cols. 15-16).

90.    U.S. Patent No. 5,248,201 (the "'201 patent"):   The '201 patent (DTX-10)[21] is entitled "Interlocking Closure for Plastic Storage Bags with Confirming Color Strips."  The patent issued on September 28, 1993.  The original assignee was Reynolds Consumer Products Inc. (which now distributes HEFTY brand and private-label reclosable bags).  *See* FOF ¶ 47.  In describing the prior art, the specification discloses that transparent bag closures "make it difficult to actually determine whether the male and female closure strips are fully mated together, so as to completely seal the bag interior."  DTX-10 ('201 patent, col. 1:30-36).  The specification discloses that the '641 patent (*see* FOF ¶ 88) offered one solution to this problem in the form of a color change feature.  *Id.* (col. 1:53-57).  The '201 patent offered a somewhat different solution to assist users in visually confirming closure of a bag, again using different colors on the male

---

[20] DTX-9, A3550-3568 (Dkt. 28-12, NR1 Tab G).

[21] DTX-10, A3569-3577 (Dkt. 28-12, NR1 Tab H).

and female sides of the closure strip, but without a resulting color change. *Id.* (col. 2:9-24). The specification describes the invention thusly:

> An interlocking closure device including two closure elements which interlock over a predetermined length is formed along an open end of a bag to selectively open and close it. A male member projecting from a translucent web on one of the two closure elements and a female member projecting from a translucent web on the other of the closure elements are respectively differently colored. **Upon complete mating engagement, the respective colors are respectively observable through the translucent webs as continuous bands of their color. If the closure elements are incompletely mated, then both colors are observable through one or both translucent webs as adjacent band portions of their individual color.**

*Id.* ('201 Patent, Abstract)(emphasis added).  Claims 1, 4, & 5-7 expressly recite this utilitarian color element.  *Id.* (cols. 7-10).

91.     U.S. Patent No. 5,252,281 (the '281 patent): The '281 patent (DTX-11)[22] is entitled "Apparatus and Method for Manufacture of a Multi-Colored Closure Member of a Closure Profile."  The patent issued on October 12, 1992.  The original assignee is Reynolds Consumer Products Inc.  This patent is directed at apparatus and methods for producing a multi-colored zipper closure.  The specification discloses prior art closures that utilize color change for visual verification of bag closure, but describes an alternative means of using color for visual verification.

> Color interaction among the closure members enables a user to detect easily a misaligned or unmated profile visually without administering physical checks. This color interaction is achieved by use of a multi-colored closure member.

*Id.* (col. 2:50-54).

> To indicate whether a perfect closure has been achieved along the predetermined length, the first color is apparent where the closure elements are properly interlocked, but the first color is substantially masked by the second color where the closure elements are not properly interlocked.  Such masking allows for easy visual verification of correct mating.

---

[22] DTX-11, A3578-3586 (Dkt. 28-12, NR1 Tab I).

*Id.* (col. 3:19-26).

92.   U.S. Patent No. 5,397,182 (the "'182 patent"): The '182 patent (DTX-12)[23] is entitled "Write-On Profile Strips for Recloseable Plastic Storage Bags." The patent issued on May 14, 1995. The original assignee is Reynolds Consumer Products Inc. This patent is directed at a reclosable bag that provides webs that users can write on. In describing a preferred embodiment, however, the specification discloses the utility of colored zipper closures thusly:

> The first and second elements are mateable so that, upon mating engagement of the first and second closure elements along their substantially entire respective lengths, said open end is substantially entirely closed, and wherein at least one of the first and second closure elements is colored a certain color so that upon substantially entirely complete mating of the first and second closure elements, the certain color is visually observable through an opposing one of the webs as a continuous band of said certain color. The web carrying the first or second closure element of said certain color is opaque to provide contrast with said certain color when the first and second closure elements are viewed through the opposing web."

*Id.* (col. 3:41-55). Claim 5 expressly recites this utilitarian feature. *Id.* (cols. 8-9).

93.   U.S. Patent No. 5,527,112 (the "'112 patent"): The '112 patent (DTX-13)[24] is entitled "Adhesive Closure for Flexible Bags." The patent issued on June 18, 1996. The original assignee is Dowbrands L.P. The specification discloses that the use of a colored closure is helpful in locating the position of the closure and that a color-change feature also can be used to visually confirm occlusion.

> **The channel strip 60 may optionally be colored in order to more easily locate their position on the bag.** In another embodiment, the adhesive and/or the roughened surface may also be colored with different colors initially which change into a third color upon closing to provide for closure indication. For example, the adhesive may be yellow and the roughened surface may be blue to make green upon attaching the two closure members together; or other color combinations to make a third color can be used.

---

[23] DTX-12, A3587-3595 (Dkt. 28-12, NR1 Tab J).

[24] DTX-13, A3596-3607 (Dkt. 28-12, NR1 Tab K).

*Id.*, col.6:57-65 (emphasis added).

94.   <u>U.S. Patent No. 5,564,834 (the "'834 patent")</u>: The '834 patent (DTX-14)[25] is entitled "Adhesive Closure Having Enhanced Burst Strength for Flexible Bag."  The patent issued on October 15, 1996.  The application for the '834 patent was filed on the same day as the application for the '112 patent.  The original assignee of the '834 patent is also Dowbrands L.P. Like the '112 patent, in describing one embodiment, the specification of the '834 patent also discloses that the use of a colored closure is helpful in locating the position of the closure and that a color change feature can be used to visually confirm closure.

> **The channel strip 70 may optionally be colored in order to more easily locate their position on the bag.**  In another embodiment, the adhesive and/or the flap member surface may also be colored with different colors initially which change into a third color upon closing to provide for closure indication.  **For example, the adhesive may be yellow and the flap member surface may be blue to make green upon attaching the two closure members together; or other color combinations to make a third color can be used.**

*Id.* (col. 7:24-33)(emphasis added).

95.   <u>U.S. Patent No. 6,581,249 (the "'249 patent")</u>: The '249 patent (DTX-15)[26] is entitled "Closure Device."  The patent issued on June 24, 2003.  The original assignee is The Glad Products Company.  The patent is directed to a slider zipper closure.  While proposing that a closure using a slider is superior to prior-art press-to-close zippers, the specification expressly discloses that prior art color change features greatly improve a user's ability to visually confirm bag closure.  In this discussion, the specification expressly references the '786 and '641 patents (FOF ¶¶ 85, 88) and the color-change zipper closure sold under the GLAD-LOCK trademark.

> A number of solutions to this problem have been attempted.  For example, U.S. Pat. Nos. 4,186,786, 4,285,105, and 4,829,641, as well as in Japanese patent application No. 51-27719, disclose fasteners that provide a visual indication that

---

[25] DTX-14, A3608-3620 (Dkt. 28-12, NR1 Tab L).

[26] DTX-15, A3621-3680 (Dkt. 28-12, NR1 Tab M).

the male and female closure elements are properly occluded. Specifically, a color change means for verifying the occlusion of the male and female members of the closure is provided wherein male and female members having different colors are employed, and, upon occlusion, provide yet a different color. For example, the female member of the closure may be opaque yellow and the male member of the closure may be translucent blue. Upon occlusion of the male member and female member a composite color with a green hue results. **This use of a color change greatly improves the ability of the user of the interlocking closure device to determine when the male and female members are occluded.**

The change in color that is viewed when dissimilarly colored male and female members are occluded is demonstrated in a commercially available product sold under the trademark GLAD-LOCK (Glad-Lock is the registered trademark of First Brands Properties, Inc., Danbury, Conn., United States of America). This color change effect may be enhanced by the incorporation of a color change enhancement member in the closure device, as disclosed in U.S. Pat. No. 4,829,641.

*Id.* ('249 patent, col. 1:42-67)(emphasis added). Claims 59 and 61 expressly recite this utilitarian color element. *Id.* (col. 41).

96. U.S. Patent No. 6,925,688 (the "'688 patent"): The '688 patent (DTX-17)[27] is entitled "Closure Device." The patent issued on August 9, 2005. The original assignee is The Glad Products Company. The specification discloses the use of a color element that allows the user to visually confirm bag closure.

In addition, the fastening strips have a visual indication of occlusion of the closure device. Thus a user will be able to visually confirm that the closure device has been properly occluded, not only while in the process of occluding the closure device, but also after the closure device has been occluded. The visible indication of occlusion will be observed from the top of the closure device. The closure elements have a first color and the flanges have a second color. If the fastening strips are properly occluded the first color will not be visible by viewing the top of the closure device.

*Id.* (col. 1:47-57); *see also* col. 2:47-58. Claims 1 and 11 expressly recite this utilitarian color element. *Id.* (cols. 7-8).

---

[27] DTX-17, A3685-3698 (Dkt. 28-12, NR2 Tab N).

97.   <u>U.S. Patent No. 7,137,736 (the "'736 patent")</u>: The '736 patent (DTX-18)[28] is entitled "Closure Device for a Reclosable Pouch." The patent issued on November 21, 2006. The original assignee is S.C. Johnson Home Storage, Inc. In describing an embodiment, the specification discloses the use of color in closure strips that will form a solid line when the two sides of the closure are properly mated.

> When the closure elements 44a, 44b and 50a, 50b are correctly mated, the alternating pink and clear (or other visual characteristic) portions of the webs 188c, 188d come together to form a substantially full line of substantially uniform color (or other visual characteristic) to indicate closure thereof.

*Id.*, col. 7:50-55.

98.   <u>U.S. Patent No. 7,260,871 (the "'871 patent")</u>: The '871 patent (DTX-19)[29] is entitled "Ventable Interlocking Closure Strip." The patent issued on August 28, 2007. The original assignee is The Clorox Company. In describing an embodiment, the specification discloses the use of a zipper closure that is opaque on one side and translucent on the other and how that configuration is useful in visually determining bag closure. It also discloses that a color change element can be used for this purpose, citing the '641 patent as an example.

> The particular coloration of the thermoplastic material may have an advantageous effect on the color change characteristics of the closure, since light dispersing properties of the colored thermoplastic material are important. For example, the male element portion may be translucent and the female element portion may be opaque. When the male and female element portions are occluded, a different color is provided for establishing visually the occlusion. The fastening device may also include a color change enhancement member or members as disclosed in U.S. Pat. No. 4,829,641. U.S. Pat. No. 4,829,641 is incorporated herein by reference in its entirety.

*Id.* (col. 8:1-12). Claims 14, 16-19, and 33-38 expressly recite utilitarian color elements. *Id.* (cols 9-11).

---

[28] DTX-18, A3699-3718 (Dkt. 28-12, NR2 Tab O).

[29] DTX-19, A3719-3733 (Dkt. 28-12, NR2 Tab P).

99.   <u>U.S. Patent No. 7,543,361 (the "'361 patent")</u>: The '361 patent (DTX-20)[30] is entitled "Closure Device Providing Visual Confirmation of Occlusion." The patent issued on June 9, 2009. The original assignee is The Glad Products Company. The specification discloses how prior art colored closures have been used to visually confirm occlusion of the zipper strip.

> For example, the male and female fastening strips may include pigments so as to provide a visual indication of occlusion of the closure device. The conventional use of such pigments is known in the art and has been discussed above. For example, the male element may be translucent and the female element may be opaque. When the male and female element portions are occluded, a different color is provided for establishing visually the occlusion. The closure device may also include a color change closure as disclosed in U.S. Pat. No. 4,829,641. U.S. Pat. No. 4,829,641 is incorporated herein by reference. Thus, the closure device could have two visual indications of occlusion. The first visual indication would be the color from the opened surface alteration as noted above. The second visual indication would be the different color provided when the opaque female element is occluded with the translucent male element as noted above.

*Id.* (col. 11:54-col. 12:2).

100.   <u>U.S. Patent No. 7,611,284 (the "'284 patent")</u>: The '281 patent (DTX-21)[31] is entitled "Closure Device." The patent issued on November 3, 2009. The original assignee is The Glad Products Company. The Abstract discloses the invention's use of a color change element to confirm occlusion of the zipper closure.

> For example, the closure elements on one fastening strip may be colored with an opaque pigment, and the intermediate area on that fastening strip may be colored with a first translucent pigment. The closure elements on the other fastening strip may be colored with a translucent pigment, and the intermediate area on that fastening strip may be colored with a second opaque pigment. When the closure device is occluded, the colors of the first and second pigments combine to cause a change in color. The change in color may be observed from either side of the closure device.

*Id.* (Abstract). Claim 1 expressly recites this utilitarian color change element. *Id.* (col. 10).

---

[30] DTX-20, A3734-3797 (Dkt. 28-12, NR2 Tab Q).

[31] DTX-21, A3798-3822 (Dkt. 28-12, NR2 Tab R).

101.   <u>U.S. Patent No. 8,215,839 (the "'839 patent")</u>:   The '839 patent (DTX-22)[32] is entitled "Multistep Occluding Zipper with Sealing Features."   The patent issued on July 12, 2012.   The original assignee is The Glad Products Company.   In discussing "Related Art," the specification discloses use of a color change element in the zipper to confirm closure, as exemplified by the '786 and '105 patents (*see* FOF ¶¶ 85-86).

> One technique for aiding in the determination of the state of zipper is to utilize a zipper that imparts a visual color change upon closure.   Different colors may be utilized in each of the opposing zipper profiles to produce a third distinct color when interlocked.   Zippers utilizing such a color change are seen in U.S. Pat. Nos. 4,186,786 and 4,285,105

*Id.* ('839 Patent, col. 1:11-43).

### b.   Trial Evidence

102.   ITW did not offer any evidence or testimony about the third-party patents that are of record. FOF ¶¶ 84-101.   ITW relies only on incorrect lawyer arguments in its trial brief.

103.   At trial, ITW made a point of offering evidence (to which Poly-America objected) about early Ziploc bags that did not include color in the closure.   But, even if proven, it is irrelevant that Dow initially sold plastic bags without a colored line. Day 1 Tr. 107.   Dow's later addition of a colored line is strong evidence of the improved functionality resulting from the addition of color and the first of the two claimed functions – *i.e.*, using a color element to identify the point of opening.   *See* FOF ¶ 89 (discussing DTX-9; claims 13-14 of this Dow patent claim structure for three sensory touchstones – **visual**, tactile, and aural).

### D.   <u>Advertisements and Publicity Evidencing Functionality of the ITW Marks</u>

#### 1.   *Evidence from the TTAB Trial Record*

104.   For many years, ITW's predecessors, Flexigrip and Minigrip, touted the utilitarian advantage of its colored closures in promotional materials they began using in the early 1960s.

---

[32] DTX-22, A3823-3838 (Dkt. 28-12, NR2 Tab S).

DTX-37 at A4346-4351 (Dkt. 29-10; Ausnit TTAB Depo. at 42:8-47:15); DTX-39 & DTX-40

(Dkt. 29-10; Ausnit TTAB Depo. Exs. 7 & 8).  One promotional brochure, for example, stated:

> FLEXTITE zippers (vinyl) and POLYTITE zippers (polyethylene) are
> developments of the original products.  They are opened and closed by simple use
> of fingers.  This action is made possible by addition of a flange to one of the
> extruded sets of ridges; the flange, available in clear or several colors, is lifted to
> open the fastener.  **FLEXTITE's color flange immediately identifies the point
> of opening.**

DTX-40 at A4417 (Dkt. _29-10; Ausnit TTAB Depo. Ex. 8) (emphasis added).  At the bottom,

this brochure also listed Flexigrip's thicket of patents, including the Ausnit '434 patent.  *Id.*

105.    Another brochure, DTX-39 at A4411-4415 (Dkt. 29-10; Ausnit TTAB Depo. Ex.

7) contained similar language:

> FLEXTITE zippers (vinyl) and POLYTITE zippers (polyethylene) are
> developments of the original products.  They are opened and closed by simple use
> of fingers.  This action is made possible by addition of a flange to one of the
> extruded sets of ridges: the flange, available in clear, or several colors, is lifted to
> open the fastener.  FLEXTITE's **color flange is a trademark** of Flexigrip.  **It
> also serves a practical purpose.  It immediately identies the point of
> opening.**

*Id.* at A4411 (ITW0122) (emphasis added).  This brochure also listed Flexigrip's patents,

including the Ausnit '434 patent.  *Id.* at A4415 (ITW0126).

106.    Minigrip/Flexigrip created Ausnit TTAB Depo. Exs. 7 and 8 (Dkt. 29-10; DTX-

39 & DTX-40) in the early 1960s, and Minigrip/Flexigrip sent these brochures to customers and

prospective customers.  DTX-37 at A4346-4351, A4353 (Dkt. 29-10; Ausnit TTAB Depo. at

42:8-47:15, 53:17-22).

107.    In January 1976, **more than 10 years after** DX-39 (Dkt. 29-10; Ausnit TTAB

Depo. Exhibit 7) was created, Minigrip submitted a copy of that same brochure to the USPTO as

a "sample advertising brochure" in response to a request from the examiner during the

prosecution of the application which issued as the '114 Registration.  ITW's Response to which

this brochure was attached stated: "the applicant submits herewith a sample advertising brochure printed by its immediate predecessor in title and **still utilized by the applicant**. This brochure is attached hereto and marked Exhibit A [sic, Exhibit B]." DTX 49 at A4646 (Dkt.28-14; excerpt from prosecution history of the '114 Registration at ITW0136) (emphasis added).[33]

108.    ITW's predecessors sold zipper tubing with a horizontal colored line to Kennedy Car Liner ("KCL"). In turn, KCL used the zipper tubing to construct bags, which KCL then sold to others as KCL products, for various uses. DTX-37 at A4330, A4338-4339 (Dkt. 29-10; Ausnit TTAB Depo. at 19:8-21, 34:6-35:7); DTX-64 at A4920 (Dkt. 29-11; ITW Responses to Requests for Admission Nos. 118 [sic] & 119 [sic]).

109.    The May 1962 issue of the industry publication *Modern Packaging* included an article entitled "Outline for Zip Opening." *See* DTX-50 at A4655-4662 (Dkt. 28-14). This article featured a reclosable plastic bag KCL manufactured for RCA's Parts and Accessories Division, which included a colored line (black) to mark the closure profile of the bag. The Table of Contents listing for this article includes the following text:   "What good is an 'invisible' convenience feature? A hard-to-spot resealable closure on RCA's new film bag for TV-set parts is now identified by a black horizontal line that stands out sharply against the bag's transparent surface." *Id.* at A4661. (POLY7701). The subtitle for the same article reads: "Black line on lip of RCA's polyethylene bag for TV parts directs user attention to 'invisible' resealable closure." *Id.* at A4662 (POLY7702). The article itself, *inter alia*, states: "The film bag's handy but hard-to-spot resealable closure is identified by a black horizontal line that stands out in bold relief against the transparent surface of the package and by copy that reads: 'Lift **black line** to open'

---

[33] The referenced brochure, date stamped by the USPTO on January 5, 1976, is marked Exhibit B to the Office Action Response, also date stamped January 5, 1976. *See* DTX-49 at A4649. 4653 (Dkt. 28-14; ITW0121 & ITW0125). The same brochure is elsewhere referred to in the same Office Action Response as Exhibit B. *Id.* at A4647 (ITW0137).

and 'Press **black line** to close.'" The photographs that accompany the article depict the RCA bag manufactured by KCL. *Id.* at A4662 (POLY7702) (emphasis added). An enlargement of these photographs shows the referenced "black line" and the instruction "Lift black line to open" and "Press black line to close." *See* DTX-52 at A4666-4668 (Dkt. 28-14; enlargements of photographs from DTX-50, POLY7702).

110.    One of the photographs that appear in this May 1962 *Modern Packaging* article also appears in the Flexigrip brochure marked as Ausnit TTAB Depo. Exhibit 7 (DTX-39, Dkt. 29-10), which Minigrip submitted to the Patent Office in 1976 (FOF ¶ 107, *supra*). *See* DTX-53 at A4669-4671 (Dkt. 28-14; comparison of photo from Ausnit TTAB Depo. Ex. 7 and photo from May 1962 *Modern Packaging*).

111.    The October 1962 issue of industry publication *Plastics World* also included an article that featured a reclosable plastic bag manufactured by KCL, which incorporated a colored line (black) to mark the closure profile of the bag. DTX-54 at A4672-4698 (Dkt. 28-14). The article was entitled "Closure Key," with the subtitle "Color line locates seal strip at a glance." The article stated: "A thin colored line is the key to the success of a polyethylene bag which has won two awards in the National Flexible Packaging Association competition." DTX54 at A4678 (Dkt. 28-14; POLY7711). An accompanying photograph depicted a KCL bag. *Id.* An enlargement of this photograph shows the referenced "black line" and the instruction "Lift black line to open." DTX-56 at A4684 (Dkt. 28-14; enlargement of photographs from DTX-54, POLY7711).

   2.   *Trial Evidence*

112.    ITW offered no evidence at trial to contradict its use of advertising brochures touting the functional advantage of ITW's colored flange or that industry publications also touted

the functional advantages of the colored flange and the use of color on a zipper closure. *See* FOF ¶¶ 104-110.

113.    On direct, Mr. Ausnit testified that the '434 patent is listed on DTX-39 because it was an important patent. This testimony is not credible. DTX-39 at ITW126 lists 28 patents under the heading "Owners of U.S. Patent Nos." *Id*. This language shows that '434 patent was listed because it was one of the patents owned by Flexigrip. In addition, the language in this Flexigrip brochure states without qualification that the "color flange" is both a trademark and it "serves a practical purpose. It immediately identifies the point of opening." *Id*. at ITW122. Mr. Ausnit's 2019 efforts to downplay the accuracy or importance of that language is not credible.

114.    Mr. Ausnit conceded that claim 6 identified two functional benefits of color on the flange and that DTX-39 promoted one of these functions – identifying the point of opening. Day 1 Tr. 132. DTX-39, at ITW 000122 ("Flextite's **color flange is a trademark** of Flexigrip. **It also serves a practical purpose**. It immediately identifies the point of opening."). ITW distributed that brochure at least as recently as 1976. PTX-93. Here also, Mr. Ausnit's Marquette University speech (*see* FOF ¶ 79) sheds light on his true motivation.

115.    Mr. Ausnit also testified at trial about DTX-40, a Flexigrip marketing flyer which also included the '434 patent among the many listed Flexigrip patents. That flyer also states that the "color flange immediately identifies the point of opening."

116.    Thus, ITW's own promotional materials show that ITW emphasized the color flange's functional purpose. These documents also confirm that the color flange is the horizontal stripe that is the subject of the three challenged registrations. Mr. Ausnit's efforts to re-write these two Flexigrip brochures to mirror ITW's new theory are not credible.

**E.**    **An ITW Consumer Study and Survey Evidence Establishes Consumer Understanding of Functional Features of Colored Closures and Preference for Colored Closures for Non-Reputational Reasons**

1.    *Evidence from the TTAB Trial Record*

a.    ITW's Own Consumer Study Demonstrates That Consumers Consider Colored Closures to be Functional

117.    Within a short period of time in 1999 and early 2000, ITW lost two of its major customers, Webster and Arrow, to which ITW had been supplying reclosable plastic bags. Webster had been reselling those bags to Walmart under Walmart's private brand. Having lost the majority of its bag business, ITW investigated how to convince Walmart to allow ITW to sell directly to Walmart. DTX-45 at A4520-4522, A4528-4531 (Dkt. 29-10; Stevens TTAB Depo. at 18:1-20:24, 26:6-29:17).

118.    Consequently, in early 2000, ITW commissioned a focus group study the stated purpose of which was "to determine consumer preference for different color combinations of zipper closures when comparing them to competitive products." DTX-45 at A4537-4546 (Dkt. 29-10; Stevens TTAB Depo. at 42:22-51:10, identifying and discussing Plourde TTAB Depo. Ex. 11); *see also* DTX-24 at A3922-3923 (Dkt. 29-9; Plourde TTAB Depo. at 124:21-125:2) & DTX-31 at A3996-4024 (Dkt. 29-9; Plourde TTAB Depo. Ex. 11).  Objectives of the focus group study included: exploring consumer perceptions and attitudes related to zipper bag attributes, and examining zipper bags usage patterns and factors that influenced usage. DTX-31 at A4000 (Dkt. 29-9; Plourde TTAB Depo. Ex. 11 at ITW4958).  Focus group panelists' reasons for their preferences for particular colors included:  "Like darker colors that show up better" and "Easier to see."  *Id.* at A4008 (ITW4966). Reasons that panelists ranked color closures as they did included:  "Could tell they were sealed if they changed color."  *Id.*  Reasons that panelists ranked color closures in terms of ease of opening and closing included:  "They could see these

46

colors without their glasses" and "Liked color coding at the top (let them know where to put their fingers to open and close products)." *Id.* at A4009 (ITW4967). Panelists also "would choose the *colored closures* over the *clear* ones if they were the *same* price." *Id.* (emphasis in original).

119.    The conclusions of the ITW focus group study included:

> The "blue and green" colored closure was the clear preference among the combinations of colored closures the panelist had to choose from. They described it as **dark enough to see**, fresh looking and good colors with food.

> Panelist felt that the colored closures visually assisted them in their efforts to open the bags with ease and close them securely. **They could see more easily where to put their fingers and could better tell when the bags were closed.** They would like the combination of the two colors to "produce a new" color (such as the yellow and blue becoming green).

*Id.* at A4026 (ITW4974)(emphasis added).   ITW **relied on and used** this information in its successful 2001 Walmart pitch. *See* DTX-24 at A3920-3921 (Dkt. 29-9; Plourde TTAB Depo. 122:2-123:16) & DTX-30 at A3981-3995 (Dkt. 29-9; Plourde TTAB Depo. Ex. 10); DTX-45 at A4539-4548, A4549 (Dkt. 29-10; Stevens TTAB Depo. at 45:22-53:21, 55:5-19, discussing Plourde TTAB Depo. Exs. 10 & 11); DTX-30 & DTX-31 (Dkt. 29-9; Plourde TTAB Depo. Exs. 10 & 11); DTX-41 at A4453-4460 (Dkt. 29-10; Kohl TTAB Depo. at 63:18-70:23, discussing Plourde Depo, Exs. 10 & 11).

        b.    The 2014 Survey Conducted by Poly-America's Expert Also Establishes That Consumers Prefer Colored Closures Over Non-Colored Closures for Functional Reasons and, Thus, That the Subject Marks Give ITW a Significant Non-Reputational Competitive Advantage

120.    In 2014, Poly-America's survey expert, Robert Klein, conducted a consumer survey, which yielded remarkably similar results to the 2000 ITW Focus Group Study. DTX-75 at A7475-7477, A7489-7491, A7493-7496, A7502-7503, A7518-7521 (Dkt. 28-3; Klein TTAB Tr. Test. at 4:2-6:3, 18:13-20:4, 20:10-13, 22:23-25:9, 31:7-32:2, 47:24-49:6, 49:15-50:2) &

DTX-76 (Dkt. 28-3; Poly-America TTAB Tr. Ex. 1, "Klein TTAB Report").[34]

121.    Mr. Klein designed and conducted "a market research survey . . . to measure whether or not consumers prefer plastic bag products that use color on the reclosable fastener strips to those that do not use color on this part of the bag, and if so, to identify factors driving that preference."    DTX-76 at A7567 (Dkt. 28-3; Poly-America TTAB Ex. 1, Klein TTAB Report at 3, POLY7409); DTX-75 at A7494-7495, A7502-7505, A7515 (Dkt. 28-3; Klein TTAB Tr. Test. at 23:12-24:9, 31:23-34:2, 44:2-11).

122.    As Mr. Klein summarizes in his expert report: "The results of the survey show that respondents preferred to purchase the bag with the colored reclosable fastener strip over the bag with the colorless strip.  When those who selected Bag Q [the bag with the colored closure strip] were asked to explain the reason for their purchase choice, approximately half of the respondents mentioned color in their response.  Moreover, approximately two-thirds of those who selected Bag Q and mentioned color also made reference to a functional benefit of the colored fastener strip.  The results suggest that respondents' preference for Bag Q was not driven by brand reputational reasons; only 7% of the respondents who selected Bag Q referenced a specific brand or prior experience with an unspecified brand when explaining their purchase choice and of that 7%, three-quarters referenced functional benefits of Bag Q." DTX-76 at A7574-7575 (Dkt. 28-3; Klein TTAB Report at 10-11, POLY7416-17).    Examples of these responses appear in the Klein TTAB Report DTX-76 at A7576 (*id.* at 12, POLY7418) and

---

[34] Mr. Klein is the Chairman of Applied Marketing Science, Inc., a market consulting company. DTX-75 at A7475 (Dkt. 28-3; Klein TTAB Tr. Test. at 4:2-17).  Mr. Klein has been in the business of doing market research for more than 45 years. *Id.* at A7488 (Klein TTAB Tr. Test. at 17:17-20).  Appendix A to the Klein TTAB Report summarizes Mr. Klein's work history and qualifications at the time of his 2014 TTAB report.  DTX-76 at A7579-8584 (Dkt. 28-3; Poly-America's TTAB Tr. Ex. 1, Klein TTAB Report, Appendix A). *See also* DTX-76 at A7566-7567 (Dkt. 28-3; Klein TTAB Report at 2-3); DTX-75 at A7477-7489, A7492-7493 (Dkt. 28-3; Klein TTAB Tr. Test. at 6:4-18:12, 21:7-22:22).

include:  (a) "The colored strip helps me know when I have completely closed the bag;"  (b) "The pink strip makes it easier to see the seam to close the bag;"  (c) "The pink stripe shows me where to connect;"  (d) "The zipper is colored for ease of use;" and (e) "I think its easier to see and subsequently seal, to find the part and match it up to close. I think the color adds a nice touch to it but mostly I think its easier to match up both sides and seal it with the color/tab that way." The full results of the survey are included in the Appendices to the Klein TTAB Report. *See* DTX-76 at A7605-7640 (Dkt. 28-3; Klein TTAB Report, App. G). *See also* DTX-75 at A7512-7514, A7517-7521 (Dkt.  28-3; Klein TTAB Tr. Test. at 41:22-43:7, 46:7-48:7, 48:17-49:6, 49:14-50:2).

123.    Based on the results of the survey, Mr. Klein concluded the following:

> The results of the survey I conducted clearly show that relevant **consumers would prefer to purchase a reclosable plastic bag with a colored horizontal fastener strip** compared to a bag with a colorless horizontal fastener strip. Further, **consumers preferred the bag with the light pinkish fastener strip for non-reputational reasons**. In addition, approximately two-thirds of the respondents who selected the bag with the light pinkish fastener strip **referenced one or more functional benefits of the colored strip when explaining their purchase choice**. As a result, it is my opinion that the ITW trademarks for the use of color on plastic bag reclosable fastener strips afford a significant non-reputational competitive advantage.

DTX-76 at A7578.  (Dkt. 28-3; Klein TTAB Report at 14, POLY7420)(emphasis added).

2.    *Trial Evidence*

124.    ITW's expert, Mr. Poret, performed a 2019 survey allegedly to "scientifically assess the extent to which the Color Line Trademark on a resealable plastic bag functions to make the bag **easier** for a consumer **to use**, including whether it makes it **easier to find where to open** the bag **or how to reclose** the bag." Day 2 Tr. 4, 11 (emphasis added).  His survey is so seriously flawed that his resulting opinions and testimony are not credible.

125.    The Poret survey failed to make the intended assessment.  Mr. Poret conceded "that the word 'easier' connotes a comparison of the relative ease of use of two different things." *Id.*, Tr. 35.  But, **not one** of the 608 respondents in the Poret Survey was allowed to compare the Test Bag and the Control Bag.  Thus, no respondent had the opportunity to compare the two bags or evaluate whether one bag was easier to use than the other.  *Id.*, Tr. 37-38, 50.  Mr. Poret had two separate data sets and relied on statistics in an effort to infer a relative conclusion – without showing any respondent both the Test Bag and the Control Bag.

126.    Common sense suggests that if a universe of respondents were shown both bags, the vast majority would conclude the black line made it easier to find where to open the Test bag than the bag without a line.  In this case, common sense is reinforced by ITW's business-driven 2000 focus group study (DTX-31, DTX-30, DTX-32), as that study was explained by TTAB testimony from Kohl (DTX-41 Tr. 63-69) and Stevens (DTX-45 Tr. 45-55); by the 2014 Klein report and TTAB testimony (DTX-75, DTX-76); and, by testimony from Mr. Dauber about using surveys with open-ended questions to make business decisions for ITW.  Day 2 Tr. 130-31. Each participant in ITW's critical 2000 study compared, rated, and answered open-ended questions about different bags.  DTX-31.  Common sense is also confirmed by Mr. Klein's survey testimony.  FOF ¶¶ 120-123.

127.    The Poret survey also failed to capture at least one of the functional features identified by Poly-America, *i.e.*, that the colored line assists users in determining **whether** the bag is open or closed.  Instead, respondents were asked to rate the ease of determining **how** to close the bag.  Day 2 Tr. 174-176 (Klein).  Thus, even were his methodology otherwise sound (which it is not), the Poret survey was lacking in necessary substance as well.

128.   Mr. Poret's survey also glosses over a crucial step in ascertaining whether one bag is "easier" to use than the other.  Two groups of respondents, each shown only one bag, could reach similar conclusions about the relative ease of use of their respective bag.  However, given the chance – which they were not – respondents could still have overwhelmingly found one bag relatively "easier" to use than the other.  *Id.*, Tr. 173-174 (Klein) (Poret "was really inferring the comparative measure from what was really an individual measure.  And so two bags could be both – both be easy to use but one could be overwhelmingly easier to use.").   Mr. Poret improperly uses statistics to gloss over this data gap.

129.   The universe Mr. Poret used in his survey was under-inclusive, and his report lacked data allowing the under-inclusive nature of his universe to be quantified.  Day 2 Tr. 47.  Mr. Poret admittedly limited the universe to **purchasers and potential purchasers**, even though his survey was intended to measure the extent to which a colored line made it easier for **users** to find where to open the bag and determine how to close the bag.  *Id.*, Tr. 12.  He rationalized that a typical survey universe consists of purchasers and potential because "those are the individuals whose opinions and perceptions **influence purchase decisions**." *Id.* Mr. Poret tried to justify limiting his universe to purchasers by noting that the 2014 Klein survey (which Poret had not reviewed prior to preparing his report) also used purchasers and potential purchasers as the survey universe.  *Id.*, Tr. 12-13.   Mr. Klein's 2014 survey, however, focused on the preferences of "**purchasers** of reclosable plastic bags," not Poret's targeted **user** universe.  Day 2 Tr. 12 (Poret testimony); Day 2 Tr. 208 (Klein testimony).

130.   Mr. Poret's universe was also under-inclusive by excluding those under 18, despite the absence of any data justifying this exclusion.  Mr. Poret even admitted his three minor children are **users** of recloseable bags.  Day 2 Tr. 47.

131.   Mr. Poret's survey universe is also under-inclusive because it excluded potential respondents who need glasses or contacts but did not have them, although he had no data showing that people who wear glasses or contacts always wear them when they use reclosable plastic bags. *Id.*, Tr. 47-48. Mr. Poret acknowledged his report did not indicate the percentage of **users** who were excluded by the purchaser requirement or the age limitation. Day 2 Tr. 46-47.

132.   Mr. Poret conceded that he had tested "only one manifestation of the Color Line Trademark," *id.*, Tr. 48, and that he **was not** opining there was no functional benefit to the color line strip on the zipper. *Id.*, Tr. 41.

133.   Mr. Poret's testimony also flies in the face of Mr. Dauber's common sense concession about the functionality of sensory touchstones and directly contradicts both the methodology and the results of the focus group study ITW commissioned in 2000 and used to enter the consumer retail reclosable bag market. Day 2 Tr. 130-31; FOF, ¶¶ 117-19FOF ¶¶ 117-119.

134.   Mr. Poret's inferences are based on improperly applied statistics and a survey designed to deprive respondents of the opportunity to make their own comparisons. His testimony is entitled to no weight. Day 2 Tr. 172-179, 184-87.

135.   There are, moreover, additional flaws that, considered as a whole, make the results of Mr. Poret's survey purely subjective and speculative, and ultimately unreliable. Characterizing a survey in which individuals subjectively apply a rating ranging from "extremely easy" to "extremely difficult" as an objective measure of functionality, Day 2 Tr. 26 (Poret), does not make it objective or change the results, which are nothing more than a compilation of respondents' subjective assessments of the one bag they examined. Day 2 Tr. 178 (Klein).

Moreover, the Poret survey made no attempt to collect other data that might have improved the reliability of his unsupported inferences. For example, the survey did not require interviewers to: (1) record how much time it took respondents to find the opening of the bag or close the bag; (2) determine or record whether respondents actually succeeded in fully closing the bags; or (3) record how many attempts it took respondents to fully close the bag. Interviewers were not required to report spontaneous comments. *Id.*, Tr. 42-43. Interviewers also did not ask any open-ended questions in this survey, although Mr. Poret has used such questions in other surveys. *Id.*, Tr. 46. These failings make Poret's survey subjective, speculative, and ultimately reliable.

136.   Mr. Klein's 2019 rebuttal report and testimony identified the flaws in Poret's 2019 survey and in his opinions based on that survey. During his testimony, Mr. Klein confirmed that his 2019 report referred to his 2014 survey to identify what Poret's 2019 survey did not do – such as measuring purchaser preferences or using open-ended, follow-up questions. Day 2 Tr. 182, 210. While ITW viewed that reference as an opportunity for a second cross-examination of Mr. Klein for his 2014 work, the Court finds ITW's 2019 attack on the 2014 Klein survey and testimony simply reinforces Mr. Klein's credibility.

137.   Mr. Klein's 2014 survey was intended to determine whether or not consumers prefer to purchase reclosable bags that use color in the reclosable fastener strips and, if so, whether their preference for bags with colored fastener strips was for non-reputational reasons. This is relevant to the functionality analysis. *See* FOF ¶¶ 120-123; COL, ¶ 75.

138.   Mr. Klein's survey addressed issues highly relevant to that analysis, *i.e.*, **whether** consumers preferred to purchase a reclosable bag with colored fastener strips or no color in the fastener strip and, if so, the reasons **why** respondents who preferred to purchase reclosable bags

with colored zipper closures chose that option. Mr. Klein's survey also used the open-ended follow-up question "Why?" Professor McCarthy explains, "[o]ften, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot." 6 *McCarthy on Trademarks and Unfair Competition*, § 32.175 at 32-404 (4th ed. 2012).

139.   Mr. Poret and ITW are simply wrong that respondents to the Klein 2014 survey could not opine on the "**why**" of their stated preference without actually using the bags. Day 2 Tr. 191. Respondents were being asked if they had a **purchasing preference** for one type of bag versus another and the reasons for their expressed preference. Hands-on manipulation of the bags was not a necessary element to answering questions about respondents' purchasing preferences based on what they saw, as shown by the 48 respondents who answered "Why?" with explanations like "easier to see;" "easy to see."

140.   ITW's 2019 Klein cross-examination simply highlights the merit of the Klein survey and the failings of the Poret survey.

**F.   Even if Considered, None, Let Alone All of the Alleged Alternative Designs Have Been Shown to be Functionally Equivalent**

*1.   Evidence from the TTAB Record*

141.   In the TTAB proceedings, ITW consistently asserted that "alternatives" to the colored bag closures are available to Poly-America. But, ITW ultimately pointed to only one supposed alternative – a zipper closure without color. See Dkt. 29-20 at A8472-8473 (ITW TTAB Brief at 37-38). ITW's only evidence of "alternatives" was testimony of a shopping trip performed by a paralegal who worked for ITW's then-counsel. The paralegal went shopping at CVS Pharmacy, Jewel-Osco, Mariano's and Wal-Mart in the Chicago area, where she purchased

a box of Ziploc products and four bags with no color. *Id.* ITW TTAB Trial Brief at A8472 (Dkt. 29-20; p. 37, citing ITW Trial Exhibits 36, 37, 39, & 42).

142.   Poly-America pointed to significant evidence that bags with clear zipper closures are not the functional equivalent of bags with colored closures.

143.   ITW touted the functional advantages of its colored flange in promotional materials. FOF ¶¶ 104-107. The functional advantages of the colored flange are disclosed in the '434 Patent, and claim 6 of that patent included this same color element. FOF ¶¶ 60-70, 75-77.

144.   Numerous third-party patents also establish that adding color to reclosable bag zipper closures serves at least two distinct useful purposes. First, the '112 and '834 Patents (Poly SOF 54-55) expressly recognize that colored closures make it easier to locate the closure on the bag. Second, virtually all of the patents discussed above disclose how colored closures can assist users with visual verification that a zipper is fully closed (or occluded) in a variety of ways, including but not limited to use of some type of color-change element. FOF ¶¶ 84-101.

145.   Participants in ITW's Focus Group Study identified functional advantages of colored zipper closures. FOF ¶¶ 117-119.

146.   Respondents in the 2014 Klein Survey likewise identified functional advantages of colored zipper closures. FOF ¶¶ 120-123.

2.   *Trial Evidence*

147.   At trial, ITW identified both recloseable bags with clear closures and others that used color (but allegedly lacked the claimed Color Line) as alleged "alternative designs" available to Poly-America. Day 1 Tr. 41-44 (Dauber); 166-175 (Plourde).

148.   First, these designs need not be considered because the claimed Color Line is functional under the "traditional" test. Whether claim 6 covered more than just a colored line

does not matter, because it covered the color line and recited the functional benefits thereof. FOF ¶¶ 74-75.

149.   Second, Messrs. Dauber and Plourde bought on their July 2019 shopping trip bags with "the color line," bags with color they contended did not need to be licensed, and bags without color. But, other than conclusory statements, **ITW offered no evidence** that the bags with clear closures or the bags with color that ITW now says don't use the Color Line are actually **functionally equivalent to** bags that use the Color Line.

150.   In all events, Glad, Reynolds, and Inteplast are Poly-America's major trash bag competitors. Day 2 Tr. 97 (Ross), 152-53 (Mallory). Each of those major competitors is an ITW licensee, according to ITW, and each also sells reclosable plastic bags with a colored line to Poly-America's major retail customers. *Id.*   Only Poly-America cannot offer to supply reclosable plastic bags with a colored line to its major trash bag customers. *Id.*

151.   For Poly-America's entry into the market, the registered configuration is the required design, not merely "the preferred" design.   Poly-America needs to be able to use a colored line on reclosable plastic bags to offer to its major retail customers a product that is brand-equivalent to Ziploc bags.   Poly-America needs to be able to supply reclosable bags with all of the functional features of the Ziploc bag, including a colored line.   Day 2 Tr. 94, 96, 98-100, 103-106, 108-10 (Ross), DTX-245, Tr. 150-51, 153-55 (Mallory).   ITW has admitted that Ziploc bags use the claimed Color Line.   FOF ¶ 50; Day 1 Tr. 171-72 (Plourde).

152.   That is the single competitively significant application at issue here.

153.   In addition, Mr. Dauber agreed that customer demand for a potential product is an important factor to be considered (Day 2 Tr. 133), but acknowledged he lacked any personal knowledge of demand by major retailers for these specific bags.   He also was unaware of how

major retail customers negotiate for products.  *Id.*, Tr. 112-14.  Mr. Dauber also agreed that unexpired third-party patents need to be assessed, but conceded he had not considered whether any of the alleged "alternative" bags were protected by patents.  *Id.*, Tr. 133-34.  Nor did ITW contradict the demand from Poly-America's major retail customers for private-label bags that are brand-equivalent to Ziploc.  *See, e.g.*, TTAB Decision, at 10 (citing evidence).

154.     For purposes of this case, this is the area of competitive significance and, indeed, competitive necessity for Poly-America.  Day 2 Tr. 106-107, 110 (Ross), 160, 164 (Mallory). Poly-America also needs to have the option to purchase zipper strips and rollstock to use in making reclosable plastic bags.  Day 2 Tr. 226-27, 230-31 (Bertrand). The proper focus of the Court's functionality analysis is the particular application that Poly-America's major retailer-customers demand, and that Poly-America seeks to supply.  TTAB Decision at 9-11.

155.     Consequently, ITW failed to show that any of the bags are functionally equivalent alternative design options truly available to Poly-America.   On the contrary, Poly-America showed there are none.

### G.     The Increased Manufacturing Cost and Complexity Associated with Adding the Claimed "Color Line" are Minimal or None

#### 1.     *Evidence from the TTAB Record*

156.     As already noted above, Mr. Bertrand Testified during the TTAB proceedings that the addition of color to the closure profile on reclosable plastic bags adds, at most, a nominal amount to total production costs.  Mr. Bertrand testified that adding color to zipper closures would add only "fractions of a cent" to the cost of manufacturing a reclosable food storage bag. In contrast, although he testified that there was additional cost, ITW's witness, Mr. Plourde, was unable to quantify the additional incremental manufacturing cost of producing reclosable plastic

bags with colored resin added to zipper closures and had not performed any recent calculations in that regard   *See supra* FOF ¶ 13 & n.9.

157.    Mr. Bertrand also testified that the addition of color does not contribute any significant complexity to the manufacturing process.  DTX-91 at A8149, A8158-8159 (Dkt. 29-17; Bertrand TTAB Tr. Test. at 29:7-12, 38:1-39:17).

*2.*   *Trial Evidence*

158.    At trial, Mr. Plourde repeated his testimony about the incremental costs involved in making bags with a colored line, which he implicitly was comparing against a bag without color.  He discussed the capital equipment ITW used to make zipper strips, but did so without quantifying the amount of the incremental difference or amortizing capital costs of the life of equipment, let alone on a per-bag basis.

159.    In contrast, Mr. Bertrand's data and calculations shows that adding color results in an incremental monthly cost of approximately $700 to make about 30 million bags.  Day 2, Tr. 214, 224-226 (Bertrand).

160.    Moreover, in view of ITW's current position that some uses of color are permitted, while others are not, there actually should be no increased incremental costs associated with using color in the form of the claimed Color Line.

**H.    ITW's Course of Conduct Resulting in Loss of Trademark Significance**

*1.*   *Evidence from the TTAB Trial Record*

161.    ITW admits that it has multiple "licensees" of the '120 Registration producing and/or selling reclosable consumer storage bags with colored closure profiles **under brands other than** ITW or Minigrip. FOF ¶¶ 42-45, 47; *see also* DTX-117 at A6252, A6255 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW4616, ITW6416); DTX-119 at A6295 (Dkt. 29-14; Poly-

America TTAB Tr. Ex. 21 at ITW 6433); *see also* DTX-41 at A4437-4443 (Dkt. 29-10; Kohl TTAB Depo. 25:1-31:3); DTX-65 at A4925 (Dkt. 29-11; ITW Response to Interrogatory No. 8).

162.    SC Johnson is an ITW licensee who manufactures and sells reclosable consumer storage bags under the ZIPLOC brand.  The ZIPLOC brand is a market leader in reclosable consumer storage bags.  DTX-109 (Dkt. 29-14; ITW TTAB Tr. Ex. 12); DTX-119 at A6295 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW 6433).  *See also* DTX-30 at A3993 (Dkt. 29-9; Plourde TTAB Depo. Ex. 10 at ITW4907); DTX-45 at A4526-4529 (Dkt. 29-10; Stevens TTAB Depo. at 24:27-27:5).  There is no evidence that any brand name other than ZIPLOC (and/or brand owner SC Johnson) appears on packaging for ZIPLOC brand reclosable bags or the bags themselves.  DTX-45 at A4533-4534 (Dkt. 29-10; Stevens TTAB Depo. at 34:15-35:25); DTX-24 at A3948-3949 (Dkt. 29-9; Plourde TTAB Depo. at 186:15-187:25); DTX-29 & DTX-30 (Dkt. 29-9; Plourde TTAB Depo. Exs. 29 & 30); DTX-105 at A6030 (Dkt. 29-14; Plourde TTAB Tr. Test. at 104:17-22); DTX-63 at A4914 (Dkt. 29-11; ITW Response to Request for Admission No. 109).

163.    ITW contends that Glad is an ITW "licensee."  Glad sells reclosable consumer storage bags under the GLAD brand.  DTX-105 at A6016 (Dkt. 29-14; Plourde TTAB Tr. Test. at 90:8-17) & DTX-112 (Dkt. 29-24; ITW TTAB Tr. Ex. 17, Glad Settlement Agreement). GLAD is also a leading national brand of reclosable bags.  DTX-30 at A3993 (Dkt. 29-9; Plourde TTAB Depo. Ex. 10 at ITW4907); DTX-45 at A4527-4528 (Dkt. 29-10; Stevens TTAB Depo. at 25:17-26:24).  One condition of ITW's license with Glad, however, is that ITW consented to Glad's registration of its own trademark for reclosable plastic bags using its "yellow plus blue makes green" colored closure.  *See* DTX-112 at A6171 (Dkt. 29-14; ITW TTAB Tr. Ex. 17 at ITW7043, ¶ 6).  There is no evidence that any brand name other than Glad (or its

predecessors or affiliates) ever appeared on the packaging for GLAD brand reclosable bags or the bags themselves. *See, e.g.,* DTX-59 at A4716-4717, A4724-4725 (Dkt. 28-14; POLY7606-7607, 7614-15); DTX-60 at A4800, A4805-4808, A4825-4834 (POLY7731, 7738-7740, 7765-7784); DTX-105 at A6031-6032 (Dkt. 29-14; Plourde TTAB Tr. Test. at 105:12-106:5); DTX-63 at A4914 (Dkt. 29-11; ITW Response to Request for Admission 110).

164.   ITW sold its U.S. reclosable bag manufacturing business in 2012 to Inteplast and, thereafter, ceased selling reclosable bags in the United States. DTX-105 at A6016, A6018 (Dkt. 29-14; Plourde TTAB Tr. Test. at 90:23-25, 92:6-15); DTX-45 at A4535-4536 (Dkt. 29-10; Stevens TTAB Depo. at 37:24-38:25); DTX-63 at A4911, A4915 (Dkt. 29-11; ITW Responses to Requests for Admission Nos. 93 & 119).   ITW, however, retained ownership of the subject marks.   ITW had, and continues to have, multiple unrelated licensees that manufacture private-label reclosable consumer storage bags, which are sold by retailers as store brands. FOF ¶¶ 42-45, 47; *see also* DTX-45 at A4539-4540 (Dkt. 29-10; Stevens TTAB Depo. at 44:22-45:15).   The brand name that appears on the packaging for these private-label brands is that chosen by the store selling them. FOF ¶ 45.

165.   National brands, such as ZIPLOC and GLAD, and private-label store brands are competitors in the reclosable consumer storage bag market. DTX-45 at A4546-4548, A4549 (Dkt. 29-10; Stevens TTAB Depo. at 51:10-53:21, 55:5-19) & DTX-30 at A3993 (Dkt. 29-9; Plourde TTAB Depo. Ex. 10 at ITW4907).   A consumer might encounter ZIPLOC brand reclosable bags, GLAD brand reclosable bags, and/or private-label brand reclosable bags next to each other on store shelves. DTX-78 at A7789-7790 (Dkt. 29-16; Ross TTAB Tr. Test. at 9:19-10:22).

166.    Until 2000, ITW and its predecessors did not manufacture and sell reclosable consumer storage bags directly to retailers, such as Walmart.  ITW licensees (and non-licensees) manufactured and sold reclosable consumer storage bags to retailers.   Although ITW took actions to enforce its '120 Registration against some non-licensed third-party manufacturers, ITW, by its own admission, ignored one of the major national brands, GLAD, for many years. ITW did not pursue any action against Glad until business exigencies forced ITW to begin to sell private-label reclosable consumer bags directly to large retailers.  DTX-45 at A4550-4551 (Dkt.29-10; Stevens TTAB Depo. at 64:8-65:24, discussing Plourde TTAB Depo. Ex. 12 and the business exigencies); *see also* DTX-24 at A3924 (Dkt.29-9; Plourde TTAB Depo. at 133:2-12); & DTX-32 at A4029 (Dkt. 29-9; Plourde TTAB Depo. Ex. 12 at ITW4913).  ITW's decision to move into direct sales to retailers was prompted by ITW's loss of sales to Webster and Arrow (who in turn sold to retailers).  These losses represented approximately 80% of ITW's sales of consumer storage bags.   Webster, for example, had been a major supplier of private-label reclosable consumer storage bags to Walmart.  DTX-45 at A4521-4522, A4529-4531 (Dkt. 29-10; Stevens TTAB Depo. at 19:14-20:7, 27:20-29:14).

167.    By 2000, Glad's "yellow and blue makes green" reclosable consumer storage bags had been on the market for at least fifteen years.  Glad began selling these color-change reclosable consumer storage bags as early as the mid-1980s, and the product soon became a leading national brand.  DTX-57 (A4685-4690) & DTX-58 (A4691-4694) (Dkt. 28-15; N.Y. Times article regarding Glad reclosable bags dated 10/21/1986); *see also* DTX-30 at A3993 (Dkt. 29-9; Plourde TTAB Depo. Ex. 10 at ITW4907).

168.    In October 2001, Glad filed a product design trademark application for reclosable bags.  *See* DTX-59, A4695-4787 (Dkt. 28-14; prosecution history for U.S. Reg. No. 2,818,766).

As described in the registration, the Glad product design mark "consists of a translucent blue closure half and a translucent yellow closure half, when joined to close the bag, form a green colored closure across the bag adjacent to its top. Color is claimed as a feature of the mark." *Id.* at AA4696, A4743 (Dkt. 28-14; POLY7586 & 7633).

169.   More than 10 years earlier, in 1990, Glad was granted a registration for its "yellow and blue makes green" packaging logo design. DTX60, A4788-4858 (Dkt. 28-14; Trademark Reg. No. 1,592,945 and prosecution history excerpts, including packaging specimens). One of the packaging specimens submitted by Glad prominently displays the statement:   "When you see the green seal you know the bag is closed!"   *Id.* at A4805 (POLY7738). ITW did not oppose registration of this mark and never sought its cancellation.

170.   In May of 2002, ITW filed a Letter of Protest with the USPTO, objecting to a Glad trademark application, both on the ground that Glad's "yellow and blue makes green" product design mark was functional and on the ground that allowing the mark to issue would create a likelihood of confusion with the '120 Registration. ITW, *inter alia*, proffered the Glad '105 Patent (*see supra* FOF ¶ 86) as evidence of *de jure* functionality. DTX-61 at A4860-4862 (Dkt. 28-14;   ITW24406-08).[35] This, of course, is the very same product configuration that ITW now claims is covered by the ITW marks by virtue of its license with Glad. DTX-112 (Dkt. _29-14; ITW TTAB Tr. Ex. 17, Glad Settlement Agreement); DTX-41 at A4438-4440 (Dkt. 29-10; Kohl TTAB Depo. at 26:4-28:2, discussing Plourde TTAB Depo. Ex. 7.   Glad Settlement Agreement). *See also* DTX-105 at A6031-6032 (Dkt. 29-14; Plourde TTAB Tr. Test. at 105:12-106:5) & DTX-119 at A6295, A6298 (Dkt. 29-14; Poly-America TTAB Tr. Ex. 21 at ITW6433

---

[35] ITW stipulated to the authenticity of DTX-61. *See* DTX-72 & DTX-73.

& ITW6436); *see also*; DTX-117 at A6255, A6260 (Dkt. 29-14; ITW TTAB Tr. Ex. 28 at ITW6416 & ITW6421).

171.   In that same Letter of Protest, ITW expressly acknowledged that "[t]he [Glad] plastic bags in issue have a blue colored stripe on one side (which the application refers to as a translucent blue closure half) and a yellow colored stripe on the other side (which the application refers to as a translucent yellow closure half) **which, when combined, form a green stripe.**" DTX-61 at A4683 (Dkt. 24-18; Letter of Protest at ITW0024409)(emphasis added);   *see also* DTX-72 & DTX-73 (Dkt. 28-11; stipulation regarding attached Letter of Protest and approval by TTAB). Thus, ITW affirmatively represented to the USPTO that, when sealed, the Glad zipper closure formed a colored line of a single color.

172.   After Glad's application published for opposition, ITW sought multiple extensions of time to oppose the registration. DTX-59 at A4698-4699, A4758-4786 (Dkt. 28-14; POLY7588-89, 7648-76). Negotiations between Glad and ITW regarding this trademark dispute were by then ongoing. DTX-41 at A4445-4450, A4451 (Dkt. 29-10; Kohl TTAB Depo. at 40:3-45:10, 50:3-7, 50:13-24); DTX-43 (Dkt. 29-10; Kohl TTAB Depo. Ex. 3).

173.   Glad and ITW ultimately entered into a Settlement Agreement in August 2003. DTX-41 at A4438-4440 (Dkt. 29-10; Kohl TTAB Depo. at 26:2-28:1, discussing Plourde Ex. 7); DTX-24 at A3905-3906 (Dkt. 29-9; Plourde TTAB Depo. at 57:7-58:5); DTX-29 (Dkt. 29-9; Plourde TTAB Depo. Ex. 7, Glad Settlement Agreement). As of that date, Glad's unlicensed "yellow and blue makes green" reclosable bags had been on the market for almost twenty years. DTX-57 (Dkt.28-14); DTX-58 (Dkt. 28-14); DTX-60 (Dkt. 28-14); DTX-63 at A4911-4912 (Dkt. 29-11; ITW Response to Request for Admission No. 98).

174.    The ITW-Glad Settlement Agreement states that Glad's need for a license (and, hence, its status as a real "licensee") remains in dispute. DTX-29 (Dkt. 29-9; Plourde Ex. 7 at ¶ 2). ITW consented to Glad's trademark application for the "yellow and blue makes green" seal, which subsequently issued in 2004, although no consent agreement was filed with the USPTO. *Id.*, ¶ 6. ITW also agreed to restrict its use of colors on reclosable consumer storage bag closures, while allowing Glad to continue making and selling its "yellow and blue makes green" reclosable storage bags effectively unimpeded by ITW. *Id.*, ¶ 5. Both Glad and ITW retained the exclusive right to enforce their respective marks. *Id.* at ¶ 9.

175.    The only provision related to the quality of Glad's products states: "To the extent that Glad does infringe one or more of the Registrations and that a license is created under Paragraph 3 of this agreement, ITW agrees that any quality control inspection shall be limited to the purchase of relevant Glad products in the open market. ITW agrees that the quality of Glad's reclosable bags, as currently marketed, are of satisfactory quality." *Id.*, ¶ 8. However, ITW has no recourse under the Agreement if it ever becomes dissatisfied with the quality of any Glad products.

176.    While, pursuant to a ruling from the TTAB, ITW has withheld information about any royalty payments it receives for licenses, other evidence reveals that Glad has never paid any money to ITW under its "license." DTX-41 at A4451 (Dkt. 29-10; Kohl TTAB Depo. at 50:3-6, 50:13-24); *see also id.* at A4444, A4447-48 (Kohl TTAB Depo. at 38:19-22, 42:5-43:1); DTX-43 at A4478 (Dkt. 29-10; Kohl TTAB Depo. Ex. 3 at ITW4952, ¶3).

177.    Although some other ITW licenses may contain some form of quality control provisions (*see* DTX-109, DTX-111, DTX-113, DTX-114, DTX-115, DTX-116  (Dkt. 29-14; ITW TTAB Tr. Exs.12, 16, 18, 20, 22, & 24), the only arguably competent evidence that ITW

ever exercised any of its quality control rights are a handful of letters requesting product samples from licensees, all of which were sent **after** Poly-America filed its Petition for Cancellation on February 19, 2013. DTX-105 at A6000-6003 (Dkt. 29-14; Plourde TTAB Tr. Test. at 74:12-77:11).[36]

178.    ITW admits that its "licensees undertake their own advertising and promotional efforts" and could not identify any persons or entities that participated in licensees' advertising, promotion, and use of the subject marks.  *See* DTX-65 at A4925 (Dkt. 29-11; ITW Response to Interrogatory No. 8).

### 2.    *Judicial Admissions and Trial Evidence*

179.    In its Amended Complaint, ITW admitted that "Ziploc branded bags **incorporate the Color Line Trademark** under license from ITW . . ." Amended Complaint, ¶ 13 (emphasis added).  But, the Ziploc bags and packaging introduced at trial make no reference to ITW or its Color Line trademarks, while the Ziploc brand name is prominently displayed.

180.    ITW also admitted that, when it was manufacturing reclosable plastic consumer storage bags, these bags were manufactured as "private label bags [that ITW sold] to stores that would then mark the bags with their own label and sell them as store-branded bags.  Amended Complaint, ¶ 11.  Again, ITW presented no evidence that any reclosable plastic bags sold under license from ITW (or the packaging for such products) ever referenced the ITW registrations or mentioned any association between the colored line and ITW.

181.    ITW offered no evidence to contradict its record of indiscriminate licensing as evidenced in the TTAB record.  On the contrary, ITW's trial testimony confirms ITW continues

---

[36] In the TTAB, Poly-America's objected to ITW's TTAB Tr. Ex. 25 and Mr. Plourde's testimony concerning that exhibit.  *See* Dkt. 29-19 at A8428-8434 (Poly-America's Appendix to its TTAB Trial Brief, Objections to ITW's TTAB Trial Evidence).

these practices to date.  Day 2 Tr. 123-24.  There is certainly no evidence that the color lines used on these multiple brands of bags, sold in competition with one another, serve as a single source indicator

### I.   ITW Failed to Offer Truly New Evidence at Trial on any Disputed Material Fact Issue

#### 1.   *The TTAB Decision*

182.   On October 18, 2017, the TTAB granted Poly-America's Petition for Cancellation, finding that all three of ITW's registered product configurations are functional. The TTAB denied ITW's motion for reconsideration on December 21, 2017.  More specifically, the TTAB held that Poly-America had standing to challenge all three of the challenged ITW Registrations.   The TTAB also held that the subject matter claimed in the three ITW Registrations was functional. Poly America "established functionality . . . based upon the sixth claim in the '434 patent."

183.   Based on the evidence set forth above, and as further explained in the Court's Conclusions of Law below, there is substantial evidence in the TTAB record to support its decision on both the question of Poly-America's standing and on the ultimate question of functionality.

184.   ITW waived its right to assert here that Poly-America lacks standing to seek cancellation of the '120 Registration because ITW failed to raise this issue in its arguments to the TTAB.   *See* TTAB Decision, at 11.   In all events, however, Poly-America has standing to challenge all three ITW Registrations.

185.   In the past, ITW has asserted that completed bags with colored zipper closures infringe all of three of the subject marks. ITW also has stated in at least one license agreement that all three ITW Registrations are associated with a color line across the top of a reclosable

bag.  The products identified in the zipper flange mark registration (the '114 Registration) and the rollstock mark registration (the '243 Registration) are used in the manufacture of reclosable plastic consumer storage bags purchased by end-user consumers.  Poly-America seeks to manufacture or purchase these goods in order to compete in the market for reclosable food storage bags purchased by end-user consumers.  ITW submitted completed bags as specimens to the USPTO when it filed its combined Section 8 and 15 declarations to maintain the '114 Registration.

186.    Poly-America also has a direct commercial interest in the goods identified in each of the three ITW Registrations.  Poly-America is engaged in the manufacture and sale of goods closely related to reclosable plastic storage bags and their components, namely plastic garbage bags.  Reclosable plastic consumer storage bags for the consumer retail market are a natural expansion of Poly-America's current business.  Poly-America already has made substantial preparations to enter the reclosable plastic consumer storage bag market.

187.    Poly-America's customers have requested Poly-America to supply reclosable plastic consumer storage bags with colored closures in addition to garbage bags to achieve brand equivalence with national brand reclosable bags such as those offered by Poly-America's competitors and ITW's licensees.  Poly-America seeks not only the ability to manufacture and sell plastic recloseable plastic storage bags to its retailer customers, but also the ability to manufacture or purchase zipper closures and/or rollstock using color on or near the closure strips for purposes of manufacturing reclosable food storage bags. The last remaining impediment to Poly-America's entry into the reclosable plastic consumer bag market is the three challenged ITW Registrations.

188.   ITW has not adduced any "new" evidence on a disputed fact issue regarding Poly-America's standing.

189.   Poly-America has shown that it continues to prepare for and have the intent to enter the reclosable consumer storage bag market since the close of evidence in the TTAB proceedings

190.   With respect to the TTAB's holding that the three ITW Registrations should be cancelled, the evidence before the TTAB established that ITW's now-expired '434 patent disclosed and claimed the utilitarian feature of a flexible closure plastic bag with **a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips**. The centrality of this color element to claim 6 is confirmed by the prosecution history of the '434 patent. In order to obtain allowance of that claim, the applicant represented to the USPTO that this color element was both useful and patentable. This same color element is the subject of the three challenged ITW Registrations. DTX-39, at ITW 000122 ("Flextite's **color flange is a trademark** of Flexigrip. It also **serves a practical purpose. It immediately identifies the point of opening**.") (emphasis added). This evidence, even standing alone, constitutes substantial evidence that supports the TTAB's finding that the subject matter of the three ITW Registrations is functional.

2.   *ITW's Trial Evidence Does Not Constitute New Evidence on a Disputed Fact Issue*

191.   ITW failed to present "new" evidence on any "disputed fact issue." ITW's fact witnesses at trial were Mr. Ausnit, Mr. Plourde, and Mr. Dauber. ITW also called Mr. Lee as an adverse fact witness. None of them offered any truly new evidence on a disputed fact issue. ITW offered expert testimony by Mr. Poret, but that testimony is not directed to a disputed fact issue. *See* FOF ¶¶ 124-135 and the summary discussion below.

192.    At the TTAB, ITW used Mr. Ausnit's recollection of Minigrip/Flexigrip's story of: (1) Flexigrip/Minigrip's history; (2) Flexigrip's slider closure, including the designation "FG;" (3) Flexigrip's coloring the lip of zipper strips as a trademark and also to indicate to consumers the point of zipper opening; (4) Mr. Ausnit's subsequent change of heart; and (5) Flexigrip, Minigrip and ITW using a colored line on advertising and using the phrase "Color Line" on materials. ITW TTAB Brief, at A8447-51 (citing to materials attached to its Notice of Reliance.).

193.    At the TTAB, Poly-America offered into the record the '434 patent, its prosecution history, and testimony from Mr. Ausnit concerning statements in the '434 patent. Poly-America also introduced evidence showing Mr. Ausnit had not recalled the '434 patent in 2014 and that he had not seen the prosecution history of the '434 patent as of 2015.   DTX-37, Tr. 35-42, 68-70. Poly-America also offered into the record DTX-39, DTX-40 and testimony from Mr. Ausnit concerning those two brochures.  Those documents listed the '434 patent as one of ITW's patents and identified the color flange as both ITW's trademark and as serving the functional advantage of immediately identifying the point of opening. Id., Tr. 42-47; DTX-39, DTX-40.

194.    The TTAB Decision acknowledged that the stated object of the '434 patent was to provide a resilient fastener for a bag or pouch specifically intended to reduce the risk of accidental separation of the fastener when the bag or pouch is filled.  Indeed, the decision quoted from column 1, lines 20-23 and lines 29-41 of the '434 Patent.  TTAB Decision at 15-16.

195.    At the TTAB, ITW offered into the record a story from Mr. Ausnit about a final sales meeting he had with executives at Columbia Records. A secretary, being unfamiliar with how to use the zipper opener, ripped the reclosable fastener off the bag instead of separating the

fastener to open the bag. ITW TTAB Brief, at A8448-49 (citing to materials attached to its Notice of Reliance). Yet, the secretary had no difficulty in immediately identifying the point of opening. Mr. Ausnit did not retell this story at trial.

196.    At the TTAB, ITW offered into the record its story of its patent/trademark license with Dow Chemical, and Dow's subsequent activities, including that Ziploc bags did not initially have any color, Dow's commercials featuring an index finger. ITW TTAB Brief, at A8449 (citing to materials attached to its Notice of Reliance).

197.    At trial, Mr. Ausnit retold the story about: (1) Flexigrip/Minigrip's history; (2) Flexigrip's slider closure, including the designation "FG;" (3) Flexigrip's coloring the lip of zipper strips as a trademark and also to indicate to consumers the point of zipper opening; (4) his subsequent change of heart; and (5) about using a colored line on advertising and using the phrase "Color Line" on materials. Day 1 Tr. 91-104. At trial, Mr. Ausnit and Mr. Dauber retold the Dow story. Day 1 Tr. 30-33, 104-107.

198.    At trial, Mr. Ausnit also testified at length about the prosecution history of the '434 patent, his view of the central advantage of the '434 patent and that the claimed color feature was not a major aspect of the patent. Day 1 Tr. 108-23.

199.    None of this constitutes truly "new" evidence on a "disputed fact issue." The brochure, DTX-39, and the flyer, DTX-40 speak for themselves. They both emphasize the functional aspect of the colored flange, as well as its role as a trademark, and obtained the *in terrorum* benefit of the '434 patent. The '434 patent and the prosecution history are part of the public record, were before the TTAB and also speak for themselves. Moreover, ITW is barred from contradicting the public record, upon which competitors are entitled to rely. TTAB

Decision at 21. Thus, ITW is "estopped" from using Mr. Ausnit's repackaged testimony to rewrite the public record. TTAB Decision at 15 (quoting 1 McCarthy, §7:89.30.)

200. ITW's evidence at trial on these facts is merely a repackaged version of its evidence on these same facts from the TTAB record.

201. At the TTAB, ITW offered evidence of a shopping trip performed by a paralegal who worked for ITW's then-counsel. The paralegal went shopping at CVS Pharmacy, Jewel-Osco, Mariano's and Wal-Mart in the Chicago area, where she purchased a box of Ziploc products and four bags with no color. ITW TTAB Trial Brief, at A8455, A8472 (citing to materials attached to its Notice of Reliance).

202. At the TTAB, ITW argued that bags with no color were "the" functional equivalent to a bag with color adjacent the top. ITW TTAB Trial Brief, at A8472.

203. At trial, ITW offered testimony about a July 2019 shopping trip by Messrs Plourde and Dauber to eleven Chicago-area stores. Day 1 Tr. 42-45 (Dauber).

204. At trial, ITW offered evidence that reclosable plastic bags without color and with color, but not containing what ITW asserted at trial was its Color Line Mark. Day 1 Tr. 41-52 (Dauber). At trial, ITW also offered testimony about bags that Poly-America had purchased. Day 1 Tr. 167-76. (Plourde).

205. The Court finds that ITW has not offered any truly new evidence on a disputed fact issue. None of this evidence is relevant to Poly-America's competitively significant application, namely the major retailers who sell Poly-America trash bags and who also want to buy from Poly-America for resale private label reclosable storage bags that are brand equivalent to Ziploc brand bags. TTAB Decision, 11.

206.    In the TTAB, ITW offered testimony from Mr. Plourde that adding color to the reclosable fastener increases the cost of manufacturing that bag fastener and thus the bag itself when compared against a bag without color.  Mr. Plourde also testified that additional equipment was required to create a colored line above the equipment made to create a bag without color. Mr. Plourde also testified that adding a colored line does not make the bag or bag seal stronger or easier to seal.  Mr. Plourde also testified that consumers can readily identify the top of a bag even without color.  Mr. Plourde offered comparable testimony about adding color to zippers or strips and plastic tubing or sheeting.  Mr. Plourde did not quantify the amounts of the increased costs. ITW TTAB Trial Brief, at A8459-60, A8468-69, A8474 (citing Plourde TTAB trial testimony).

207.    At trial, Mr. Plourde repeated his testimony about the incremental costs involved in making bags with a colored line, which he implicitly was comparing against a bag without color.  He discussed the capital equipment ITW used to make zipper strips, but did so without quantifying the amount of the incremental difference or amortizing capital costs of the life of equipment, let alone on a per-bag basis.

208.    The Court finds the trial testimony about cost is not new evidence on a disputed fact issue.

209.    ITW represented at trial that there are reclosable bags with color that Poly-America is free to make.  Day 1 Tr. 39-43 (Dauber).  Consequently, the Court finds that ITW has removed the fourth *Morton-Norwich* factor as a relevant consideration since Poly-America would need the additional equipment and colored material under ITW's view to make permitted uses of color in manufacturing bags (and, thus, presumably would incur no additional costs in the manufacture of bags using the claimed Color Line).

210.    At the TTAB, ITW offered testimony from Mr. Plourde that ITW revenue for zipper products without color for 2014 was about $115 or $120 million, while revenue for zipper products with a colored line was $33.7 million.  DTX-105, Tr. 114, 120-121.

211.    At trial, Mr. Plourde offered testimony about ITW's proportionate sales of zipper products with color and without color for the four years since.  Those percentages are consistent with ITW's 2014 testimony.  Further, the Court finds testimony about Zip-Pak sales of zipper strips into a different market is not relevant to any disputed fact issue.  Consequently, for either of these reasons, the Court finds ITW has not offered new evidence on a disputed fact issue.

212.    At trial, ITW offered testimony from Brandon Lee.  The Court finds questions about Mr. Lee's personal experiences not relevant to any disputed fact issue.  The Court notes that Mr. Lee was not allowed access to most of ITW's production.  Day 1 Tr. 60.  Under those circumstances, ITW cannot benefit from any lack of information on the part of Mr. Lee.  Further, the Court finds that Poly-America did not need to perform any market studies in view of direct communications from its major retail customers.  Mr. Lee's testimony does not constitute new evidence on a disputed fact issue.

213.    At trial, ITW offered the opinion testimony of Hal Poret.  Mr. Poret performed a 2019 survey allegedly to "scientifically assess the extent to which the Color Line Trademark on a resealable plastic bag functions to make the bag easier for a consumer to use, including whether it makes it easier to find where to open the bag or how to reclose the bag."  Day 2 Tr. 4, 11 (emphasis added).

214.    The Court finds the Poret survey did not make the intended assessment and, for this reason, is not evidence on a disputed fact issue.  *See* FOF ¶ 125.

215.   Mr. Poret conceded "that the word 'easier' connotes a comparison of the relative ease of use of two different things." *Id.*, Tr. 35. But not one of the 608 respondents in the Poret Survey was allowed to compare the Test Bag and the Control Bag. Thus, no respondent had the opportunity to compare the two bags or evaluate whether one bag was easier to use than the other. *Id.*, Tr. 37-38, 50.

216.   Mr. Poret's survey failed to make the intended assessment because it glossed over a crucial step in ascertaining whether one bag is "easier" to use than the other. Two groups of respondents, each shown only one bag, could reach similar conclusions about the relative ease of use of their respective bag. However, given the chance – which they were not – respondents could still have overwhelmingly found one bag relatively "easier" to use than the other. Id., Tr. 173-174 (Klein) (Poret "was really inferring the comparative measure from what was really an individual measure. And so two bags could be both – both be easy to use but one could be overwhelmingly easier to use."). Mr. Poret improperly uses statistics to gloss over this data gap.

217.   Mr. Poret also conceded he had tested "only one manifestation of the Color Line Trademark", id., Tr. 48, and he was not opining there was no functional benefit to the color line strip on the zipper. Id., Tr. 41.

218.   Thus, the Court holds ITW has not offered any truly new evidence on a disputed fact issue. As a consequence, the Court is not required to conduct a *de novo* review of the entire record.

219.   The Court finds that the TTAB had substantial evidence in the record supporting its decision.

Based upon the above findings, the Court makes the following conclusions of law:

## II.
## CONCLUSIONS OF LAW[37]

**J.**     **The Nature of This Proceeding and the Standard of Review**

1.     On February 19, 2013, Defendant Poly-America L.P. ("Poly-America") filed a Petition for Cancellation (the "Petition") with the Trademark Trial and Appeal Board (the "TTAB") seeking cancellation of three product configuration trademarks owned by Plaintiff Illinois Tool Works, Inc. ("ITW").  On October 18, 2017, the TTAB granted Poly-America's Petition for Cancellation, finding that all three of ITW's registered product configurations are functional (the "TTAB Decision").  On December 21, 2017, the TTAB denied ITW's Motion for Reconsideration of the October 17, Decision (the "TTAB Denial of Reconsideration).  ITW filed the instant lawsuit on February 22, 2018, requesting review and reversal of the TTAB Decision pursuant to 15 U.S.C. §1071(b).

2.     On June 8, 2018, the parties filed a Joint Motion to Transmit and Submit Record of the TTAB Proceedings to Court (Dkt. 26) pursuant to 15 U.S.C. § 1071(b)(3), which provides in pertinent part:

> In suits brought hereunder, the record in the United States Patent and Trademark Office shall be admitted on motion of any party, upon such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of any party to take further testimony.  The testimony and exhibits of the record in the United States Patent and Trademark Office, when admitted, shall have the same effect as if originally taken and produced in the suit.

15 U.S.C. § 1071(b)(3)(emphasis added).

---

[37] To the extent that any of the Findings of Fact set forth in Section I, *supra*, are deemed to be Conclusions of Law they are incorporated into the following Conclusions of Law.

3.     On June 11, 2018, the Court granted the joint motion and ordered that the TTAB record "be assembled and transmitted to the Court forthwith and made a part of the record in these proceedings." (Dkt. 27). The TTAB record was transferred to and filed in this Court on July 3, 2018. Dkt. 28 & 29. Thus, the evidence in the trial record before the TTAB has been admitted and made a part of the record in this proceeding, subject to any objections properly preserved by the parties during the TTAB proceeding. In addition, pursuant to 15 U.S.C. §1071(b)(3), "[t]he testimony and exhibits of the record in the [TTAB] . . . have the same effect as if originally taken and produced in [this] suit."

4.     On August 28, 2019, the Court issued an Order resolving the dispute between Poly-America and ITW concerning the evidentiary status of the TTAB record. Dkt. 99. As a consequence, all documents and evidence offered into evidence at the TTAB are admitted for all purposes, except for any specific objections properly made by a party during the TTAB proceeding. Both sides used Poly-America's designation of TTAB evidence included in the exhibits designated as DTX-1 through DTX-122, and the Court holds that is an appropriate (and convenient) way to identify evidence.

5.     The testimony and exhibits of the TTAB record "have the same effect as if originally taken and produced in the suit." 15 U.S.C. § 1071(b)(3). However, the parties also have the right to present "new" evidence on a disputed fact question. *See* 15 U.S.C. § 1071(b)(3) (admission of TTAB record is "without prejudice to the right of any party to take further testimony"). *See also Kappos v. Hyatt*, 566 U.S. 431, 434 (2012). If "new evidence is presented to the district court on a disputed fact issue, *de novo* finding will be necessary to take such new evidence into account together with the evidence before the Board." *Id.* at 444. In such circumstances, "[t]he district court must assess the credibility of new witnesses and other

evidence, determine how the new evidence comports with the existing administrative record and decide what weight the new evidence deserves." *Id.*

6.     *Kappos* concerned a federal district court's review of a USPTO patent decision under 35 U.S.C. § 145, but the Supreme Court subsequently clarified in *B & B Hardware, Inc. v. Hargis Indus., Inc.*, ___ U.S. ___, 135 S.Ct. 1293, 1301 (2015), that *Kappos* concerned an "analogous scheme in patent law" to that when a party challenges a TTAB decision in district court under § 1071(b). *See also Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014)(citing *Kappos* and clarifying standard of review applicable when **new evidence** is admitted by District Court in review of TTAB decision pursuant to 15 U.S.C. §1071).

7.     If no new evidence is admitted that relates to a disputed fact question, the reviewing court applies the APA "substantial evidence" standard to the TTAB's findings of fact on that issue. *See, e.g., Hyatt v. Kappos,* 625 F.3d 1320, 1336 (Fed. Cir. 2010). *See also Belmora, LLC v. Bayer Consumer Care AG*, 338 F. Supp. 3d 477, 483-84 (E.D. Va. 2018)("factual findings made by the Board which are untouched by new evidence presented to the court are reviewed under the substantial evidence standard mandated by the Administrative Procedure Act"); *accord RXD Media, LLC v. IP Application Dev.*, 2019 U.S. Dist. LEXIS 52664 at ** 5-6 (E.D. Va. March 27, 2019).  Under the substantial evidence standard, findings of fact will be upheld so long as they are not arbitrary, capricious, or otherwise not in accordance with law. *Belmora*, 338 F. Supp. 3d at 488.

### K.     Poly America Has Standing to Seek Cancellation of the ITW Marks

8.     Substantial evidence supports the TTAB's repeated findings that Poly-America has standing to challenge U.S. Trademark Registration Nos. 0946120, 1055114, and 1294243.

9.     ITW waived its right to assert that Poly-America lacks standing to seek cancellation of the '120 Registration because ITW failed to raise this challenge in its arguments

to the TTAB. TTAB Decision at 11 ("Respondent does not challenge Petitioner's standing with regard to the colored line mark registration," *i.e.*, the '120 Registration).

10.     ITW has not adduced "new" evidence on any fact issue regarding Poly-America's standing. The TTAB's finding that Poly-America has standing to challenge all three trademarks is supported by substantial evidence and affirmed.

11.     To the extent new evidence was introduced on standing, the Court has conducted a *de novo* review, assessing the credibility of new witnesses and other evidence, determined how any such new evidence comports with the existing administrative record, and decided what weight the new evidence deserves. Based on its review, the Court has determined that Poly-America has standing to challenge all three trademarks. *See generally* FOF ¶¶ 1-29.

12.     Section 14 of the Trademark Act establishes a broad class of persons who are proper petitioners; by its terms, the statute only requires that a plaintiff have a belief that it would suffer damages if the mark is registered. 15 U.S.C. § 1064. A petitioner merely needs to demonstrate that it has a "real interest," *i.e.,* a direct and personal stake, in the outcome of the proceedings and a reasonable basis for its belief of damage. *Ritchie v. Simpson*, 170 F.3d 1092, 1097-99 (Fed. Cir. 1999), *abrogated on other grounds by Iancu v. Brunetti*, 588 U.S. ___, 139 S. Ct. 782, (2019); *see also Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024,1028-29 (CCPA 1982); *Universal Oil Prod. Co. v. Rexall Drug & Chem. Co.*, 463 F.2d 1122, 1123 (CCPA 1972). "A belief in likely damage can be shown by establishing a direct commercial interest." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000).

13.     In its decision granting Poly-America's Petition for Cancellation, the TTAB explained what is necessary to establish standing to seek cancellation on the grounds of functionality and abandonment as follows:

[W]e note that, to establish its standing to assert a mere descriptiveness or genericness ground of opposition or cancellation, "a plaintiff need only show that it is engaged in the manufacture or sale of the same or related goods as those listed in the defendant's involved application or registration and that the product in question is one which could be produced in the normal expansion of plaintiff's business; that is, that plaintiff has a real interest in the proceeding because it is one who has a present or prospective right to use the term descriptively in its business." *Binney & Smith Inc. v. Magic Marker Indus., Inc.*, 222 USPQ 1003, 1010 (TTAB 1984). A petitioner is required only to be in a position to have a right to use the mark in question. [Citing *Ritchie*]. This test logically also applies to the question of whether Petitioner has standing to assert its claim that Respondent's mark has been abandoned due to its loss of significance as a mark or comprises matter that, as a whole, is functional. *See Nobelle.com LLC v. Qwest Comm'cns Int'l Inc.*, 66 USPQ2d 1300 (TTAB 2003); *Doyle v. Al Johnson's Swedish Rest. & Butik Inc.*, 101 USPQ2d 1780 (TTAB 2012). Moreover, if Petitioner can show standing on the ground of functionality, it has the right to assert any other grounds, including abandonment. *See Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1877 (TTAB 2011). For a functionality claim, standing is also established, inter alia, if plaintiff shows that it is a competitor. *AS Holdings, Inc. v. H & C Milcor, Inc., f/k/a Aquatico of Texas, Inc.*, 107 USPQ2d 1829 (TTAB 2013). "A belief in likely damage can be shown by establishing a direct commercial interest." [Citing *Cunningham*]

*See* TTAB Decision at 7-9; *see also* TTAB Denial of Reconsideration at 6-9.

14.     Poly-America established before the TTAB, and any "new" evidence only reinforces, that Poly-America has a direct commercial interest in the goods identified under the three challenged ITW Registrations and an expectation of harm resulting from its inability to enter the reclosable plastic consumer storage bag market due to ITW's enforcement of the three ITW Registrations at issue. *Ritchie*, 170 F.3d 1092 at 1097-99; *Lipton Indus.*, 670 F.2d at 1028-29 ; *Universal Oil*, 463 F.2d at 1123; *Cunningham*, 222 F.3d at 945; *Binney*, 222 USPQ at 1010. (Fed. Cir. 2000). *See* FOF ¶¶ 1-29.

15.     Poly-America has established that it has a direct commercial interest in the goods identified in each of the three ITW Registrations for at least the following reasons. Poly-America is engaged in the manufacture and sale of goods closely related to reclosable plastic storage bags and their components, namely plastic garbage bags. Reclosable plastic consumer

storage bags for the consumer retail market are a natural expansion of Poly-America's current business. Poly-America is a position to have a right to use the marks claimed in the ITW Registrations and already has made substantial preparations to enter the reclosable plastic consumer storage bag market. Based on ITW's licensing and enforcement practices, Poly-America reasonably believes that it risks an infringement lawsuit that would include all three of the challenged ITW Registrations unless they are cancelled. The last remaining impediment to Poly-America's entry into the reclosable plastic consumer bag market is the three challenged ITW Registrations. Poly-America's customers have requested Poly-America to supply reclosable plastic consumer storage bags with colored closures in addition to garbage bags to achieve brand equivalence with national brand reclosable bags such as those offered by Poly-America's competitors and ITW's licensees. Poly-America seeks not only the ability to manufacture and sell plastic recloseable plastic storage bags to its retailer customers. but also the ability to manufacture or purchase zipper closures and/or rollstock using color on or near the closure strips for purposes of manufacturing reclosable food storage bags. *See* FOF ¶¶ 1-29.

16.    Poly-America has standing to seek cancellation of all three ITW Registrations on the grounds of functionality and to seek cancellation of the '120 Registration on the ground of abandonment.

**L.    The Marks Claimed in the ITW Registrations are Functional**

17.    Substantial evidence supports the TTAB finding that Poly America "established functionality . . . based upon the sixth claim in the '434 patent." TTAB Decision at 27; *see also* TTAB Denial of Reconsideration at 12-13.

18.    Substantial evidence supports the TTAB finding that Poly-America was, therefore, not required "to present evidence fitting within all four categories in *Morton-Norwich*"

to prevail on its claims of functionality.  TTAB Decision at 13, 27; *see also* TTAB Denial of Reconsideration at 13-16.

19.  ITW has not adduced "new" evidence on any disputed fact issue.  The TTAB's factual finding that the three trademarks are functional is supported by substantial evidence and affirmed.

20.  To the extent ITW introduced "new" evidence on functionality in this proceeding, the Court has conducted a *de novo* review, assessing the credibility of new witnesses and other evidence, determined how any such new evidence comports with the existing administrative record, and decided what weight the new evidence deserves.  Based on its review, the Court has determined that the product configurations claimed in the three ITW Registrations at issue are functional.

   *1.*   *Functional Product Designs and Configurations are not Eligible for Trademark Protection*

21.  "If a product feature is functional it cannot be protected trade dress.  Unless protected by patent or copyright, functional product features may be copied freely by competitors in the marketplace." *Eppendorf-Netheler-HINZ GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir.2002)(citing *TrafFix* Devices *Inc. v. Mktg. Displays Inc*, 532 U.S. 23, 29 (2001)).  As the Supreme Court reminded us in 1995, "[i]t is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . . after which competitors are free to use the innovation.  If a product's functional features could be used as trademarks, however, a monopoly over such features. . . could be extended forever (because trademarks may be renewed in perpetuity)." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995).

22.     Six years later, the Court emphasized the significance of an expired patent to the question of trade dress functionality.  "A prior patent, we conclude, has vital significance in resolving the trade dress claim.  A utility patent is strong evidence that the features claimed therein are functional." *TrafFix*, 532 U.S. at 29.  The Court explained that "'[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Id.* at 32 (citing *Qualitex*, 514 U.S. at 165).  This is sometimes referred to as the "traditional" definition or test of functionality. *Eppendorf*, 289 F.3d at 355.  Moreover, a functional feature is one the "exclusive use of [which] would put competitors at a significant nonreputation-related disadvantage." *Id.* This is sometimes referred to as the "competitive necessity" test. *Id.* at 356.

23.     Under the traditional test, "[a] feature is 'essential to the use or purpose' of a product if it serves any significant function other than to distinguish a firm's goods or identify their source." *Poly-America, L.P. v. Stego Indus., L.L.C.*, 2011 U.S. Dist. LEXIS 82647 at **32-33 (N.D. Tex. July 27, 2011)(citing *Qualitex*, 514 U.S. at 165-66).  In *Stego*, the district court emphasized "[t]he Court made this point particularly clear in *TrafFix*, 532 U.S. at 33, by finding the disputed mark in that case functional because 'beyond serving the purpose of informing consumers that the sign stands are made by MDI (assuming it does so), the dual-spring design provides a unique and useful mechanism to resist the force of the wind.'" *Id.* at *33 (citation omitted).  Importantly, the district court explained that "'[e]ssential,' as used in the traditional test of functionality, therefore, **does not equate to a layman's understanding** of the word; it is a term of art used to distinguish product features that **only** serve to identify a product's source from those that serve 'any other significant function.' *See Qualitex*, 514 U.S. at 166." *Stego*, 2011 U.S. Dist LEXIS 82647 at *33 (emphasis added).

24.     A second test for functionality is the "competitive necessity" test. *Eppendorf*, 289

F.3d at 356.  As the *Stego* court explained:

> Under this test, "a functional feature is one the 'exclusive use of which would put
> competitors at a significant non-reputation-related disadvantage.'" *Id.* [289 F.3d
> at 356] (quoting *Qualitex*, 514 U.S. at 165).  This test is an expansion of the
> traditional test, and is not of itself a comprehensive definition of functionality. *Id.*
> Indeed, "[t]he primary test for functionality is the traditional test, and there is no
> need to consider the 'competitive necessity' test where a product feature is
> functional under the traditional definition." *Id.* (citing *TrafFix*, 532 U.S. at 33-35).

2011 U.S. Dist. LEXIS 82647 at **17-18.

25.     The  analytical  framework  used  by  the  Federal  Circuit  and  the  TTAB  in

determining functionality reflects these same guiding principles.  In 1982, the Court of Customs

and  Patent  Appeals  identified  four  potentially  relevant  factors  in  assessing  trademark

functionality: (1) the existence of a utility patent disclosing the utilitarian advantages of the

design; (2) advertising  materials  in  which  the  originator  of  the  design  touts  the  design's

utilitarian advantages, (3) the availability to competitors of functionally equivalent designs; and

(4) facts  indicating  that  the  design  results  in  a  comparatively  simple  or  cheap  method  of

manufacturing  the  product.   *In re Morton-Norwich Prods., Inc.*, 671  F.2d  1332, 1340-41

(C.C.P.A. 1982).  This analytical framework is consistent with the Supreme Court's holding in

*TrafFix.  See, e.g., Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002)

("We do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton-

Norwich* analysis.").  In *Stego*, the court cited with approval and relied on *TrafFix*, *Valu Eng'g*,

and *Morton-Norwich, see* 2011 U.S. Dist, LEXIS 82647 at **24-28, as did the TTAB in this

case.  TTAB Decision at 12-15, 20, 27-28; TTAB Denial of Reconsideration at 12-16.

26.     *TrafFix* also is instructive on several important consequences flowing from a

finding of functionality.  For example, whether a design has acquired secondary meaning "need

not be considered." *TrafFix*, 532 U.S. at 33; *see also id.* at 34-35 ("The Lanham Act . . . does

not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular product or feature with a single manufacturer or seller."). Consequently, assertions or evidence of secondary meaning are an irrelevant distraction from the analysis of functionality.

27.    If a product design is found functional under the traditional test, there is no reason to engage "in speculation about other design possibilities ... which might serve the same purpose." *Id.* at 33. *See also Valu Eng'g*, 278 F.3d at 1276 (if "a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs because the feature cannot be given trade dress protection merely because there are alternative designs available."); *In re Bose Corp.*, 772 F.2d 866, 871 (Fed. Cir. 1985); *id.* 772 F.2d at 871 ("availability of other forms or shapes [for product] does not detract from the functional character of the subject configuration, particularly where the configuration sought to be registered is 'the preferred or a superior design'")(citation omitted).

28.    *Valu Eng'g* clarified that a product feature need not be functional in all applications to fall outside the scope of a legally protectable trademark. A single. competitively-significant application is sufficient to support a finding of functionality, without considering all possible uses. 278 F.3d at 1277-78 ("[f]unctionality may be established by a single competitively significant application"). As the *Stego* court explained:

> To hold otherwise would tie resolution of the functionality question to a review of the "entire universe of potential uses of a contested mark ..., seriously undermin[ing] the goals of the functionality doctrine" by making it more difficult to find *de jure* functionality in a product feature that unequivocally offers utilitarian benefits in some — but not all — applications. See *id.* [citing *Valu Eng'g*]. This would countermand the Supreme Court's caution against "misuse or overextension of trade dress," *TrafFix*, 532 U.S. at 29, because the functionality doctrine plays a vital role in limiting the reach of trade dress protection. *Eppendorf*, 289 F.3d at 355 ("The requirement of non-functionality 'prevents trademark law, which seeks to promote competition by protecting a firm's

reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.'"). The weaker the functionality doctrine is in practice, the more likely that trademark protection will be extended to product features that otherwise would be open to copying. *See Sportvision, Inc. v.Sportsmedia Technology Corporation*, No. C 04-3115 JW, 2005 U.S. Dist. LEXIS 22682, 2005 WL 1869350, at *4 (N.D. Cal. Aug. 4, 2005) ("Functionality is a judicially-created doctrine that limits the aspects of a product configuration which may be trademarked.").

2011 U.S. Dist. LEXIS 82647 at **26-27.

29.     Finally, ITW's registration of the marks on the principal register created only a rebuttable presumption that the marks are valid.  "Incontestability under Section 15 [15 U.S.C. §1065] is not relevant to the question of available claims in a cancellation proceeding.  Section 15 provides incontestable rights of **use** and to that extent is irrelevant, inasmuch as once a registration has been in existence for five years the grounds on which a cancellation action may be brought are limited under Section 14 regardless of whether Section 15 incontestability has been invoked."  *Rickson Gracie, LLC v. Rorion Gracie*, 67 USPQ2d 1702, 1703-04 (TTAB 2003)(emphasis added)(citing *In re Best Software Inc.*, 63 USPQ2d 1109, 1112 (TTAB 2002)(collecting cases));  *Strang Corp. v. The Stouffer Corp*, 16 USPQ2d 1309, 1311 (TTAB 1990)).  Mr. Samuels' reference to the marks' "incontestable" status is an irrelevant red herring, since he conceded that does not prevent challenges based on functionality (or abandonment). Day 2 Tr. 79-80.

30.     Poly-America bears the initial burden of presenting evidence sufficient to make out a *prima facie* case of functionality.  Once the party seeking cancellation has presented evidence sufficient to make out a *prima facie* case of functionality, the burden shifts to the mark holder to prove nonfunctionality.  *See Stego*, 2011 U.S. Dist. LEXIS 82647 at **18-24 (discussing burden-shifting framework & collecting cases); *see also Valu Eng'g*, 278 F.3d at 278-79 (citation omitted).

2. *The Ausnit '434 Patent Establishes that the "Colored Line" Product Configuration that is the Subject of the Three Challenged ITW Registrations is Functional*

31.     Substantial evidence supports the TTAB's finding that Poly America "established functionality under *Inwood* [*i.e.* the "traditional test" of functionality] based upon the sixth claim in the '434 patent." *See* TTAB Decision at 27.

32.     Substantial evidence supports the TTAB finding that Poly-America was, therefore, not required "to present evidence fitting within all four categories in *Morton-Norwich*" to prevail on its claims of functionality. *Id.*

33.     ITW has not adduced any "new" evidence that creates a factual dispute about the TTAB's finding the '434 patent disclosed and claimed the utilitarian feature of a flexible closure plastic bag with a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips, as confirmed by the prosecution history of the '434 patent. The TTAB's factual finding that the subject matter claimed in the three challenged ITW Registrations is functional is supported by substantial evidence and affirmed.

34.     To the extent "new" evidence was introduced on functionality, the Court has conducted a *de novo* review, assessing the credibility of new witnesses and other evidence, and determined that the three trademarks are functional.

35.     As noted above, in *TrafFix*, the Supreme Court recognized the "vital significance" of a patent in resolving a trade dress claim: "A utility patent is strong evidence that the features claimed therein are functional." 532 U.S. at 29-30, 58 USPQ2d at 1005. Professor McCarthy explains that this rule is highly relevant when the person claiming trademark protection is the same person that applied for the patent.

> [A patent] is particularly entitled to great weight if the patent was applied for by the same person who now asserts trademark significance in the same configuration. A kind of estoppel arises. That is, one cannot argue that a shape is

functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection. **Functional patent protection and trademark protection are mutually exclusive.** As one court stated, when the configuration is disclosed in a functional patent, and the patent expires, the public "now has its inning."

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §7:89.30, at 7-324.4 (4th ed. 2012) (citation omitted) (emphasis added). *See also Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119-120 (1938)(biscuit shape fell into the public domain upon expiration of the basic patent.) ITW's position about the exclusionary scope of its registrations would bar the public from practicing the third-party patents as they expired. FOF ¶¶ 40, 46, 84-101. *Cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165 (1989) ("For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws *do* create a federal right to "copy and use."). (Emphasis in original).[38]

36.     The '434 patent discloses and claims the same color element that is the subject of the three challenged ITW Registrations. The patent speaks for itself, and it is undisputable that the patent says what is says. ITW also cannot challenge statements made during the prosecution of the application that resulted in the '434 patent. The '434 patent and its prosecution history are not only substantial evidence that supports the TTAB's finding of functionality, they are themselves undisputable evidence. FOF ¶¶ 60-70.

---

[38]The Supreme Court once again reiterated the importance of avoiding improper extension of patent rights, albeit in the context of patent licensing in 2015. *Kimble v. Marvel Entertainment, LLC*, ___ U.S. ___, 135 S. Ct. 2401, 2407 (2015) ("In case after case, the Court has construed those laws to preclude measures that restrict free access to formerly patented, as well as unpatentable, inventions. . . . By virtue of federal law, we reasoned, 'an article on which the patent has expired,' like an unpatentable article, 'is in the public domain and may be made and sold by whoever chooses to do so.'") (citations omitted).

37.     For completeness of the record, the Court nevertheless sets forth its own summary of the language in the '434 patent and its prosecution history that establish the functionality of the three ITW Registrations.

38.     The '434 patent, entitled "Bag Closure" issued on September 18, 1962.   The Court takes judicial notice that the '434 patent expired in 1979.   Steven Ausnit is one of the named inventors of the '434 patent, which was owned by ITW's predecessors.   The patent is for an "article such as a pouch or similar container having a new and improved resilient type fastener structure particularly adapted to minimize accidental separation of the engaged portion of the fastener structure when subject to load forces." '434 patent, column 1, lines 8-13.

39.     The specification of the '434 patent discloses that the resilient fastener strips consist of mating ribs and grooves located on flaps, with an optional slider, that are squeezed together to close the bag or pouch.   The patent further discloses that the bag or pouch closure may be attained without use of a slider.

40.     In discussing Figure 5, the specification states:

> In FIGURE 5 is shown a modified type of pouch 7'. In this case, the pouch 7' is identical to the pouch 7 except that this is a sliderless type of pouch.  The pouch 7' includes a pair of strips 9', 9' which are identical to the strips 9, 9 as shown in the first form of the invention except that no shoulders are required to assist in holding the slider onto the strips as was case in the illustrated form shown in FIGURES 1-4. **In order to facilitate identification of the flanges as means to assist in the separation of the strips 9', 9' when they are engaged together, the flanges may be colored differently than the strips themselves. Excellent results may be obtained where the strips 9', 9' are of a clear color while one or both of the flanges 40, 41 are of a red color.**

'434 patent, column 4, lines 52-70 (emphasis added); *see also id.* Figure 5.

41.     FIGURE 5, on the drawing page of the '434 patent, depicts a sliderless closure for a bag or pouch consisting of flanges (40 & 41) that may be colored differently from the strips (9') enabling their identification to facilitate separation.  Thus, as described above and as shown in

FIGURE 5, the patent particularly discloses that coloring one or both of the flanges red while the strips are clear colored may achieve excellent results.

42.     Claim 6 of the '434 patent expressly recites this color element and the functional advantage it provides:

> 6. A flexible closure comprising a pair of flexible closure strips each having a web portion and a marginal portion integral therewith, the marginal portions having interlocking rib and groove elements extending therealong and forming a lock between the marginal portions when engaged, one of the marginal portions being alongside its associated web portion and joined thereto by a portion extending laterally between said one marginal portion and its associated web portion and being integral therewith formed of one piece with said one marginal portion and associated web portion, said lateral portion being above the longitudinal centerline of the marginal portions when engaged, and a separating flange on the marginal portion of at least one of said strips for separating the strips and the rib and groove elements and disengaging the lock, **said flange being colored differently than the strips to facilitate identification of the flange and assist in separation of the strips.**

'434 patent claim 6, column 6, lines 29-46)(emphasis added).

43.     Thus, the patent claims as a feature of the invention a flexible closure consisting of flexible strips with interlocking ribs and grooves that join together to form a lock when engaged.  The strips include a flange (40 & 41) to allow separation of the rib and groove elements of the strips (9') to disengage the lock. The flange is colored differently than the strips to assist in identifying the flange and separating the strips.  The bolded language of claim 6 in the preceding paragraph defines the same features of the three challenged ITW Registrations, namely the colored stripe on the recloseable fastener strips shown in each of the three registrations.  This is evident from a side-by-side comparison of the drawings for the marks in the registrations and Figure 1 of the '434 patent.  Figure 1 of the patent shows the bag (7) and fastener structure (8) is remarkably similar to Respondent's three registrations, albeit with the slider (25) type of pouch rather than the sliderless type described in claim 6:



(colored line mark, zipper flange mark, and rollstock mark registrations)



(The '434 patent drawing, Fig. 1)

44.     The prosecution history of the '434 patent confirms that the patentees considered the color element in claim 6 to be utilitarian and patentable.   In response to an initial and subsequent rejection of the color line feature by the Patent Examiner assigned to the application underlying the '434 patent, ITW's predecessor argued that the claim ultimately amended to claim 6, "**requires flange members with one of the flange members being colored**.  The Examiner contends that this is a matter of design or skill, but **it is not shown by the prior art, affords an advantage, and cannot be regarded as obvious without a basis in the prior art**." DTX-38 at A4392 (Ausnit TTAB Depo. Ex. 6 at POLY7546)(emphasis added).

45.     The patent documents speak for themselves, and claim 6 makes clear the colored line is a central feature of the claimed invention.  ITW's predecessor's marketing materials, used while the '434 patent was still extant, confirm that the colored line was a central feature.

46.     "The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled

to rely on those representations when ascertaining the degree of lawful conduct . . . ."

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

47.     In addition, there is no evidence that ITW sought to disclaim claim 6 of the '434 patent based upon any alleged *ex post facto* realization that those features of the invention recited in the sixth claim conferred no functional benefit. *See* 35 U.S.C. § 253 ("A patentee, whether of the whole or any sectional interest therein, may . . . make disclaimer of any complete claim, stating therein the extent of his interest in such patent."). Indeed, rather than disavowing the functional advantage of its patented colored flange, ITW's predecessors stated in advertising brochures that the "color flange immediately identifies the point of opening" and "also serves a practical purpose. It immediately identifies the point of opening." *See* DTX-40 at A4417 (Dkt. 29-10; Ausnit TTAB Depo. Ex. 8); DTX-39 at A4411-4415 (Dkt 29-10; Ausnit TTAB Depo. Ex. 7).   ITW's predecessors listed the '434 patent, among others, in its advertising brochures and utilized one of the same brochures in the application underlying one of the colored line mark registrations.

48.     It is irrelevant that the colored flange was only one element of claim 6, or that claimed the use of color on the flange as opposed to the closure itself.  What is significant is that Claim 6 clearly describes a flexible closure with a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips.  It is likewise irrelevant that, as ITW has argued, the marks would not infringe claim 6 the '434 patent.  Indeed, it is irrelevant if the functional feature is even recited in a particular claim (although it is here). "*TrafFix* does not require that a patent claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not *de jure* functional. . . . *TrafFix* teaches that statements in a patent's specification illuminating the

purpose served by a design may constitute equally strong evidence of functionality." *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 1375 (Fed. Cir. 2012) (citing *TrafFix*, 532 U.S. at 32-33, 34-35). The issue is whether anything in the patent, its specification, or statements made in prosecution disclose the functionality of the marks. That is certainly the case here. *See In re Bose Corp.*, 772 F.2d at 872 ("readability of patent claims on structure is not [the] test of functionality for trademark purposes.").

49. It also is irrelevant that the color element of claim 6 was only one part of a larger claim. What is important for purposes of the functionality analysis it that Claim 6 recites expressly recites a "flange being colored differently than the strips to facilitate identification of the flange and assist in separation of the strips." '434 Patent, claim 6. Moreover, ITW's predecessors expressly relied on the color recited in claim 6.

50. In the TTAB, ITW contended that there was ambiguity as to the manner in which color was used in the invention that is the subject of the '434 patent, an argument flatly rejected by the TTAB.

> Claim 6 clearly describes a flexible closure consisting of a pair of flexible closure strips having interlocking ribs and grooves with a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips. With regard to Respondent's assertion that it has not sought to improperly lengthen the protection conferred by the '434 patent, we need not and do not make any finding as to Respondent's intent in obtaining registrations for the involved marks. A determination of Respondent's intent is not necessary for our functionality analysis.

TTAB Decision at 25. *See also Hockerson-Halberstadt,* 222 F.3d at 957 (Fed. Cir. 2000) ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct . . . .").

51.     Mr. Ausnit's attempts at trial to rewrite history and to denigrate the significance of the functional role of the colored flange claimed in the '434 patent, or to somehow distinguish it from the "Color Line" claimed in the challenged registrations are not credible. *See generally* FOF ¶ 105. Mr. Ausnit conceded that claim 6 of the '434 patent identified two functional benefits of color on the flange and that the Flexigrip marketing brochure promoted the colored flange as **both the trademark and as performing one of these functions** – identifying the point of opening. *See* FOF ¶ 105; DTX-39 at A4410-4415 (Dkt. 29-10; Ausnit TTAB Depo. Ex. 7 at, Flexigrip brochure) ("Flextite's **color flange is a trademark** of Flexigrip. **It also serves a practical purpose. It immediately identifies the point of opening.**") (emphasis added). This is the very same brochure that ITW's predecessor submitted to the USPTO at its request for samples of advertising or promotional material with the claimed mark. FOF ¶ 107. That same brochure also lists the '434 patent as one of ITW's patents, putting others on notice not to copy the claimed subject matter. Day 2 Tr. 132 (Dauber).

52.     Thus, ITW's predecessor equated its "color flange" (*i.e.*, the same color element that is disclosed in the '434 patent and expressly claimed in claim 6) with its claimed trademarks, which it also conceded serves a "practical purpose," *i.e.*, identifying the point of opening. The colored flange of the '434 patent is the horizontal stripe claimed in the three challenged ITW registrations.

53.     Whether or not claim 6 of the '434 patent covered more than just a colored line on the flange does not matter, because it covered the color line and recited the functional benefits thereof. FOF ¶¶ 69-70, 74-75. *See In re Dietrich*, 91 USPQ2d 1622, 1633 (TTAB 2009)("The fact that the patents may encompass a wide variety of spoking patterns means only that the patents are broad in scope, not that applicant's particular applied-for design is not functional.").

Indeed, the proper inquiry is whether anything in the patent, its specification, or statements made in prosecution disclose the functionality of the marks. That is certainly the case here. *See In re Bose Corp.*, 772 F.2d at 872 ("readability of patent claims on structure is not [the] test of functionality for trademark purposes.").

54.     *Hockerson-Halberstadt* characterized the patent owner's efforts to disavow an inventor's statement in the prosecution history as an improper "request for a mulligan." *Id.* That is essentially what ITW wants as well. *See also Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purpose of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history"). This Court agrees with the TTAB on this issue. The patent expressly and plainly discloses and claims "with a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips." '434 patent, claim 6. ITW's request for a mulligan is ill-founded at best.

55.     ITW had the i*n terrorem* benefit of claim 6 until the day the '434 Patent expired in 1979. Allowing ITW to extend that benefit, in perpetuity, under the trademark laws, runs contrary to both public policy and Supreme Court precedent. *See Qualitex,* 514 U.S. at 164 ("If a product's functional features could be used as trademarks, however, a monopoly over such features . . . could be extended forever (because trademarks may be renewed in perpetuity)." The '434 patent, particularly when coupled with the patentee's representations to the USPTO in the prosecution history, are sufficient to establish that the product configurations claimed in the three challenged ITW Registrations are functional under the "traditional test" of functionality and should be cancelled. *See TrafFix*, 532 U.S. at 33 ("if a product design is found functional under the traditional test, there is no reason to engage "in speculation about other design

possibilities … which might serve the same purpose)" *See also Valu Eng'g*, 278 F.3d at 1276 (if "a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs because the feature cannot be given trade dress protection merely because there are alternative designs available."); *In re Bose Corp.*, 772 F.2d at 871 ("availability of other forms or shapes [for product] does not detract from the functional character of the subject configuration, particularly where the configuration sought to be registered is 'the preferred or a superior design'")(citation omitted); *Eppendorf*, 289 F.3d at 356 ("The primary test for functionality is the traditional test, and there is no need to consider the 'competitive necessity' test where a product feature is functional under the traditional definition.").

56.     Under these circumstances, the Court need not consider other evidence to affirm the TTAB's conclusion that the challenged marks are functional.  However, the Court recognizes that there was substantial additional evidence before the TTAB that further supports this conclusion.

> 3.     Third-Party Patents Disclose the Utilitarian Benefits of Using Colored Closures on Reclosable Plastic Bags

57.     Third-party patents can also be relevant to the functionality analysis and may be relied on as evidence of functionality.  Any "patent is potentially relevant if it covers the feature at issue, regardless of the owner." *Kistner Concrete v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1921 n.7 (TTAB 2011); *In re Dietrich*, 91 USPQ2d 1622 at 1627 ( "third-party patents may be relied upon as evidence; a patent is potentially relevant if it covers the feature at issue, regardless of the owner.").  Moreover, as the Federal Circuit has explained, a utility patent need not "claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not *de jure* functional." *In re*

*Becton, Dickinson and Co.*, 675 F.3d at 1375. *See also In re Bose Corp.*, 772 F.2d at 872 ("readability of patent claims on structure is not [the] test of functionality for trademark purposes.").

58.     The record before the TTAB includes numerous third-party patents that are further undisputable evidence of functionality.  These patents all disclose and, in many cases, claim that adding color to reclosable bag zipper closures serves at least two distinct useful purposes.  For example, the '112 and '834 Patents expressly disclose that colored closures make it easier to locate the closure on the bag.  In addition, virtually all of the patents discussed above disclose how colored closures can assist users with visual verification that a zipper is fully closed (or occluded) in a variety of ways, including but not limited to use of some type of color-change element.  *See* FOF ¶¶ 84-101.  Indeed, ITW itself once argued that one of these patents – the '105 Patent (GOF ¶86) – established the functionality of Glad's "yellow and blue makes green" bag closure and, thus, should preclude Glad from obtaining trademark protection for that product configuration.[39]  *See* DTX-61 at A4860-4862 (Dkt. 28-11, Letter of Protest at ITW24406-08).

59.     In a Letter of Protest sent to the USPTO, ITW specifically pointed out that "[t]he [Glad] plastic bags in issue have a blue colored stripe on one side (which the application refers to as a translucent blue closure half) and a yellow colored stripe on the other side (which the application refers to as a translucent yellow closure half) which, when combined, form a green stripe."  FOF ¶¶ 170-171.  ITW's arguments that its marks do not claim a "color change feature"

---

[39] As noted above, ITW made this argument in a Letter of Protest filed with the Commissioner of Trademarks before Glad became an ITW "licensee." Yet, ITW dropped its objection to Glad's trademark application when it settled its dispute with Glad.  In accordance with the parties' agreement, ITW granted Glad a "license" under the '120, '114, and '243 Registrations, while at the same time allowing Glad the inconsistent right to obtain its own trademark registration for a product configuration (the "yellow and blue makes green" zipper closure) supposedly also covered by the ITW '120, '114, and '243 Registrations and licensed to Glad. FOF ¶¶ 170-171.

are unavailing.  ITW has carefully avoided any representations concerning the line of a single color that is formed when bags using a color change feature are sealed.  ITW has never represented that its marks do not cover the single colored line created when zippers that incorporate a color-change feature, like the Glad zipper, are sealed.  FOF ¶ 41.  In addition, as already noted, ITW also conceded that its marks cover bags with lines on both sides and bags with lines of more than one color. FOF ¶¶ 40, 42, 56.

60.    ITW's expired '434 Patent, either alone or coupled with these third-party patents present compelling evidence that the marks claimed in the '120, '243, and '114 Registrations are *de jure* functional.  Among other things, they demonstrate that major players (including Glad and S.C. Johnson among others) in the reclosable bag industry have consistently recognized the utility of, and successfully obtained patent claims covering, colored closure strips for more than 50 years.  This patent literature, even standing alone, supports cancellation of the three ITW marks. *See Phoenix Trading, Inc. v. Loops, LLC*, 2012 TTAB LEXIS 440 at **9, 15-16 (TTAB November 15, 2012) (granting petition for cancellation on basis of patent alone).

### 4.    *Advertising Touted and Publicity Praised the Utility of ITW's Colored Zipper Flange*

61.    The record before the TTAB also includes evidence of advertising and industry publications touting the functional advantage of ITW's colored flange and the use of color on a zipper closure.  This is further evidence supporting a finding of functionality.

#### a.    ITW's Predecessors Touted the Utility of its "Color Line" in Advertising.

62.    "Advertising materials in which the originator of the design touts the design's utilitarian advantages" is also a factor favoring a finding of functionality. *Valu Eng'g*, 278 F.3d at 1274-75 (citing *Morton-Norwich*).  Evidence of this sort of touting can nullify "the presumption of validity bestowed on the mark by registration." *Stego*, 2011 U.S. Dist. LEXIS

82647 at *24 (collecting cases).  In addition, articles in trade publications praisng the utilitarian advantages of product design features can also proper evidence of functionality.  .  *See In re E.R. Shaw, Inc.*, 2015 TTAB LEXIS 392 at *19 (TTAB September 29, 2015) ("Although the views expressed in these articles and advertisements are not from Applicant itself, the statements are made by and for those in the gun industry about Applicant's guns.  In this regard, they buttress the assertions of Applicant, in both its utility patent and website, that there are utilitarian advantages to a helical or spiral fluting design . . . .").

63.     As set forth above (FOF ¶¶ 104-107), ITW's predecessors touted the "practical purpose" of its colored flanges ("It immediately identities the point of opening") in promotional materials provided to customers and potential customers.  This promotional claim echoes both the specification and claim 6 of the '434 Patent, which was listed among others, in these promotional materials.  According to ITW's representation to the Trademark Office, at least one of these same brochures was in use from the early or mid 1960s until at least early 1976, when Minigrip submitted it as sample advertising "still utilized by the Applicant . . . ."  Thus, ITW relied on the utility of its colored zipper flange and bag products using it when marketing its products to customers almost until the '434 patent expired.

64.     ITW offered no evidence at trial regarding to contradict its use of advertising brochures touting the functional advantage of ITW's colored flange closure.

65.     This is further evidence supporting the Court's finding of functionality.  *See Stego*, 2011 U.S. Dist. LEXIS 82647 at *24 (evidence advertising touting functional advantages can  can nullify "the presumption of validity bestowed on the mark by registration").

b.   Third-Party Publications also Depicted and Praised the Utility of ITW's Colored Zipper Flange.

66.   In addition, articles in trade publications about KCL's reclosable bags with "colored lines" at the closure also praised their utilitarian advantages. FOF ¶¶ 108-111. These KCL products utilized colored zipper closures supplied by ITW's predecessor, Flexigrip. Although *Morton-Norwich* expressly refers to "advertising by the defendant touting the utilitarian advantages of the design," 671 F.2d at 1341, 213 USPQ at 15, the Court may properly consider such materials. *See In re E.R. Shaw, Inc.*, 2015 TTAB LEXIS 392 at \*19 ("Although the views expressed in these articles and advertisements are not from Applicant itself, the statements are made by and for those in the gun industry about Applicant's guns.  In this regard, they buttress the assertions of Applicant, in both its utility patent and website, that there are utilitarian advantages to a helical or spiral fluting design . . . .").

67.   In the early 1960s (about the same time the '434 patent issued), at least two industry publications, *Modern Packaging* and *Plastics World*, published articles about a reclosable plastic bag produced by KCL, to whom ITW's predecessors sold zipper tubing with a horizontal colored line.  The *Modern Packaging* article, *inter alia*, stated: "The film bag's handy but hard-to-spot resealable closure is **identified by a black horizontal line that stands out in bold relief against the transparent surface of the package**." A4662 (POLY7702) (emphasis added); FOF ¶ 109.  The *Plastics World* article entitled "Closure Key" (with the subtitle "**Color line locates seal strip at a glance**") stated: "**A thin colored line is the key to the success** of a polyethylene bag which has won two awards in the National Flexible Packaging Association competition." DTX54 at A4678 (Dkt. 28-14; POLY7711)(emphasis added).  FOF ¶ 111.  Both of these third party articles focused on the usefulness of the "black line" to consumers in locating the bag closure.

68.     ITW offered no evidence at trial to contradict that industry publications touted the functional advantages of the colored flange and the use of color on a zipper closure.

69.     These articles are consistent with and, as in *Shaw*, buttress the utilitarian advantage of the colored zipper flange disclosed and claimed in the '434 Patent.

c.     Focus Group and Survey Evidence Support Functionality

70.     ITW's own 2000 consumer focus group study demonstrates that consumers do turn to color to assist them in locating the end of a bag which opens and whether or not a bag was closed. FOF ¶¶ 117-119.

71.     In 2014, Poly-America's survey expert, Robert Klein, conducted a consumer survey, which yielded remarkably similar results to the 2000 ITW Focus Group Study.   FOF ¶¶ 120-123.

72.     At trial, ITW viewed Mr. Klein's testimony in rebuttal to that of Mr. Poret as an opportunity for a second cross-examination of Mr. Klein for his 2014 work.   Mr. Klein's 2019 testimony about his 2014 survey and testimony simply reinforce Mr. Klein's credibility and the soundness and reliability of his report.   Mr. Klein's 2014 survey addressed issues highly relevant to that analysis, *i.e.*, whether consumers preferred to purchase a reclosable bag with colored fastener strips or no color in the fastener strip and, if so, the reasons why respondents who preferred to purchase reclosable bags with colored zipper closures chose that option.   Mr. Klein's survey also used the open-ended follow-up question "Why?" FOF ¶¶ 137-139.   Professor McCarthy explains, "[o]ften, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot."   6 *McCarthy on Trademarks and Unfair Competition*, § 32.175 at 32-404 (4th ed. 2012).

73.     This is further evidence supporting a finding of functionality.

5.  *ITW Did Not Establish That There are Functionally Equivalent Alternatives Available to Poly-America*

74.    When "a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Eng'g*, 278 F.3d at 1276 (*citing Qualitex*).    Moreover, "[i]f the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered.  *Morton-Norwich* does not rest on total elimination of competition in the goods." *In re Bose Corp.*, 772 F.2d at 872; *id.* 772 F.2d at 871 ("availability of other forms or shapes for product does not detract from the functional character of the subject configuration, particularly where the configuration sought to be registered is 'the preferred or a superior design'"). *See also In re Honeywell, Inc.*, 532 F.2d at 182.  Thus, the proper question "is not whether the alternative designs perform the same basic function, but whether these designs work 'equally well.'" *In re E.R. Shaw*, 2015 TTAB LEXIS 392 at * 21 (*citing Valu Eng'g*, [278 F.3d at 1276] (*quoting*, J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7:75, 7-180-1 (4th ed. 2001)).  That is simply not the case here.

75.    The law is well-settled that consumer preference for a particular design configuration and the reasons for that preference are relevant to the third factor of the *Morton-Norwich* analysis (the availability of alternative designs).  *In re Morton-Norwich Prods., Inc.*, 671 F.2d at 1341.  "[I]f the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered.  *Morton-Norwich* does not rest on total elimination of competition in the goods." *In re Bose Corp.*, 772 F.2d at 872 ("availability of other forms or shapes for product does not detract from the functional character of the subject configuration, particularly where the configuration

sought to be registered is 'the preferred or a superior design'") (emphasis added); *see also In re Honeywell, Inc.*, 532 F.2d 180, 182-83 (CCPA 1976).  In addition, evidence that a particular product design presents advantages for potential customers is evidence of competitive need and supports a finding of *de jure* functionality. *Brunswick Corp. v. British Seagull Ltd.*, 35 F. 3d 1527, 1531-32 (Fed. Cir. 1994); *see also TrafFix*, 532 U.S. at 33.

76.     Once again, the relevant evidence weighs significantly in favor of functionality.

77.     The record evidence establishes that colored zipper closures are useful in that they help users both identify the location of the bag opening (and the zipper closure) and determine visually when the closure is sealed.  In other words, reclosable bags that have colored closures **work better** than those that do not.  *TrafFix*, 532 U.S. at 33, 58 USPQ2d at 1006 (product feature is functional and cannot serve as a trademark if "the feature is essential to the use or purpose of the article or if **it affects** the cost or **quality of the article**.") (emphasis added),

78.     For example, the consumer survey evidence (both ITW's focus group study and Poly-America's "consumer preference" survey), and ITW's successful Walmart pitch, confirm that reclosable bag users consider colored closures to be both superior in function to, and preferred over, clear zipper closures. The Klein Survey also confirms that ITW's marks covering the use of color on plastic bag reclosable fastener strips gives ITW a significant non-reputational competitive advantage (and, hence, place Poly-America at a significant non-reputational disadvantage). Finally, while an uncolored zipper may still close, that does not mean that the use of color on the closure is not functional, or that an uncolored zipper closure "works equally well" as a zipper closure with color.  Clearly it does not. FOF ¶¶ 117-123.  *See Brunswick Corp. v. British Seagull Ltd.*, 35 F. 3d 1527, 1531-32 (Fed. Cir. 1994)(affirming TTAB's determination that color black for outboard engines was *de jure* functional; although black did not make

engines function better as engine or affect its mechanical purposes, the color black exhibited functional purposes of color compatibility with various boat colors and making engines appear smaller). A product design that presents advantages for potential customers, such as the black outboard motors in *Brunswick*, is evidence of competitive need and supports a finding of *de jure* functionality. *Id.*; *see also TrafFix*, 532 U.S. at 32-33, 58 USPQ2d at 1006-7.

79.     Nor is ITW's "evidence" about historical ZIPLOC commercials that instructed early-users how to use reclosable bags without a color line on point. These commercials do not contradict or negate the evidence that colored closures make it easier for consumers to locate the bag opening and confirm a bag is closed. In essence, ITW asks this Court to overlook the very thing that the evidence of record demonstrates has consistently been obvious to end-user consumers, industry experts, and ITW itself – a zipper closure for a reclosable plastic bag is easier to spot (and use) when its location is marked by a colored line.

80.     The Poret survey is unreliable for the reasons set forth above. FOF ¶¶ 124-136. Most significantly, his survey failed to make the intended assessment. Mr. Poret conceded "that the word 'easier' connotes a comparison of the relative ease of use of two different things." Id., Tr. 35. But, not one of the 608 respondents in the Poret Survey was allowed to compare the Test Bag and the Control Bag. Thus, no respondent had the opportunity to compare the two bags or evaluate whether one bag was easier to use than the other. *Id.*, Tr. 37-38, 50. Mr. Poret had two separate data sets and relied on statistics in an effort to infer a relative conclusion – without showing any respondent both the Test Bag and the Control Bag. For this reason alone, the Poret survey fails to evidence that a recloseable bag with a clear closure is just as easy to use a reclosable bag using a color line.

81.     As also noted above, in the TTAB proceedings, ITW consistently asserted that "alternatives" to the colored bag closures are available to Poly-America. But, ITW ultimately pointed to only one supposed alternative – a zipper closure without color. FOF ¶ 141. Poly-America pointed to significant evidence that bags with clear zipper closures are not the functional equivalent of bags with colored closures. FOF ¶¶ 60-70, 75-77.

82.     At trial, ITW identified both recloseable bags with clear closures and others that used color (but allegedly lacked the claimed Color Line) as alleged "alternative designs" available to Poly-America. FOF ¶ 147.

83.     First, these designs need not be considered because the claimed Color Line is functional under the "traditional" test. Whether claim 6 covered more than just a colored line does not matter, because it covered the color line and recited the functional benefits thereof. FOF ¶¶ 60-70, 148.

84.     In addition, ITW offered no evidence that the bags with clear closures or the bags with color that ITW now says don't use the claimed "Color Line" are actually functionally equivalent to bags that use the Color Line, and the evidence of record is to the contrary. FOF ¶¶ 141, 148-149.

85.     Finally, the Court rejects ITW's invitation to discount the historical record of functionality and focus solely on the "now." This proceeding is not limited only to current facts and circumstances and, consistent with the Supreme Court's admonition in *TrafFix*, must take into account the '434 patent, which both disclosed and claimed the functional benefits of color on the flange. FOF ¶ 81.

86.     Even ITW's expert, Professor Samuels, acknowledged: "There is case law to say that if what is the subject matter of a utility patent is the subject of the registered mark that that is

vital – of vital significance to the question of functionality, is a key issue – to consider." Day 2

Tr. at 85. This, of course, is the very same principle the Supreme Court recognized in *TrafFix*.

*See* 532 U.S. at 28 ("A prior patent . . . has vital significance in resolving the trade dress claim.

87.     ITW's reliance on pre-*TrafFix* case law in support of its "ignore the past" position

was soundly rejected by the TTAB, with the following, detailed analysis:

> Because there are many reasons why a competitor may choose not to copy a
> utilitarian design, we cannot conclude that a previously patented configuration is
> no longer functional from the fact that competitors have not copied it. Moreover,
> the two cases cited by applicant, *In re Honeywell, Inc.*, 8 USPQ2d 1600 (TTAB
> 1988), and *In re Zippo Mfg. Co*, 50 USPQ2d 1852 (TTAB 1999), are readily
> distinguishable from the present situation. In *Zippo*, the Board found that the
> claims in the patent were for the internal mechanism of the product, and did not
> relate to the configuration for which registration was sought, which
> accommodated the internal mechanism, but was not shown by the patent to have
> utilitarian value. In the present case, on the other hand, applicant seeks to register
> the configuration of a watch that makes a particular reversing motion, and it is a
> configuration of a watch that can make this reversing motion that is the subject of
> the patent. Zippo also referred to a difference in circumstances from the time the
> applicant's lighter had been found functional by the Court in 1963 in *Zippo
> Manufacturing Company v. Rogers Imports, Inc.*, 216 F.Supp 670, 137 USPQ 413
> (SDNY 1963), and the Board's decision in 1999, specifically, evidence of several
> alternative designs, as a result of which the Board found that other manufacturers
> could compete effectively without adopting applicant's design. Zippo was decided
> prior to the Supreme Court's decision in *TrafFix* and it is doubtful, in view of the
> Court's statement therein, that if *Zippo* were decided today the Board would have
> relied so heavily on the evidence of alternative designs to distinguish the Southern
> District's decision. As for Honeywell, the Board made the comment therein that a
> number of years had elapsed since the expiration of a design patent, rather than a
> utility patent; further, this comment was made in terms of whether the Board
> could revisit the issue of the registrability of a configuration that had previously
> been found de jure functional. In the actual analysis of the *Morton-Norwich*
> factors, the Board specifically found that applicant's expired utility patents did not
> demonstrate the utility of the circular, round cover, that the claims related only to
> the inner workings of the thermostat. **In the present case, of course, the expired
> utility patents are for the configuration that applicant seeks to register**.

*In re Richemont International, S.A.*, 2006 TTAB LEXIS 251 at *33, n.12 (TTAB June 22,

2006).

88.     As in *Richemont*, this Court is also presented with an expired utility patent that claims the same configuration that is also claimed to be a trademark.  Here, the '434 patent is compelling evidence of functionality.

89.     Once the '434 patent expired, the public was free to make bags with a colored line free of ITW's threats.  *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119-120 (1938)(biscuit shape fell into the public domain upon expiration of the basic patent.)  In 2015, the Supreme Court reaffirmed the importance of avoiding improper extension of patent rights.  *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2407, (2015) ("In case after case, the Court has construed those laws to preclude measures that restrict free access to formerly patented, as well as unpatentable, inventions . . . . By virtue of federal law, we reasoned, 'an article on which the patent has expired,' like an unpatentable article, 'is in the public domain and may be made and sold by whoever chooses to do so.'")  The TTAB no longer regards ITW's pre-*TrafFix* TTAB cases as good law.  In addition, other credible evidence confirms that a colored line continues to be functional.

> 6.     *Any Increase in the Cost or Complexity of Manufacturing Bags with the Claimed Color Line is Minimal, if not Non-Existent*

90.     Increased manufacturing costs do not necessarily weigh against a finding of functionality when the increased cost results in a functionally superior product.  *See In re Pingel Enter. Inc.*, 46 USPQ2d 1811, 1821 (TTAB 1998) (using a "more complex and expensive manner in which to manufacture its product does not mean that the configuration thereof is not *de jure* functional."); *see also In re Dietrich*, 91 USPQ2d at 1637 ("[E]ven at a higher manufacturing cost, applicant would have a competitive advantage for what is, essentially . . . a superior quality wheel.").

91.     In this case, the relevant evidence of record establishes that the addition of color to the zipper closure profile on reclosable plastic bags would add, at most, a nominal amount to Poly-America's total production costs. FOF ¶ 14.  Indeed, in the TTAB, Mr. Bertrand testified that adding color to zipper closures would add only "fractions of a cent" to the cost of manufacturing a reclosable food storage bag.  This testimony was further supported by his testimony at trial, which established that adding color results would result an incremental monthly cost of only about $700 to make about 30 million bags.  FOF ¶¶ 156, 159; Day 2, Tr. 214, 224-226 (Bertrand).  Thus, Poly-America would obtain important and needed functionality for virtually no additional cost. The evidence of record establishes that the addition of color does not contribute any significant complexity to the manufacturing process. *Id.*

92.     At trial, Mr. Plourde repeated his testimony about the incremental costs involved in making bags with a colored line, which he implicitly was comparing against a bag without color.  He discussed the capital equipment ITW used to make zipper strips, but did so without quantifying the amount of the incremental difference or amortizing capital costs of the life of equipment, let alone on a per-bag basis.  This was not truly new evidence. FOF ¶ 158.

93.     Moreover, in view of ITW's current position that some uses of color are permitted, while others are not, there actually should be no increased incremental costs at all associated with using color in the form of the claimed Color Line.

94.     Finally, using a "more complex and expensive manner in which to manufacture its product does not mean that the configuration thereof is not *de jure* functional." *In re Pingel Enter. Inc.*, 46 USPQ2d at 1821; *see also In re Dietrich*, 91 USPQ2d at 1637 ("[E]ven at a higher manufacturing cost, applicant would have a competitive advantage for what is, essentially . . . a superior quality wheel.").  Under this standard, the minimal cost Poly-America will incur in the

manufacturing process does not mitigate against a finding of functionality, because the color feature results in a functionally-superior product.

       7.    *The ITW Color Line Marks are Functional and Should be Cancelled*

95.    In sum, there was substantial evidence of record before the TTAB supporting its finding that the product configurations covered by the three challenged ITW Registrations are functional and not entitled to trademark protection. In addition, the Court has reviewed the evidence of record in the TTAB, as well as "new" relevant evidence presented in this case. With respect to the latter, the Court has assessed the credibility of new witnesses and other evidence, determined how any such new evidence comports with the existing TTAB record, and decided what weight the new evidence deserves. Based on its review, the Court holds that the three challenged ITW Registrations should be cancelled on the ground of functionality. In its *de novo* review, the Court concludes that the '434 patent and its prosecution history are indisputable evidence of functionality. For this reason, the Court could conclude its analysis at this point. However, for completeness of the record, the Court will assess witness credibility and consider the *Morton-Norwich* factors in addition to the existence of utility patents. The Court concludes from its *de novo* review that Mr. Ausnit was not a credible witness, and Mr. Poret's survey does not present credible evidence on the issue of functionality. In this regard, the Court credits the testimony of Mr. Klein about the flaws in Mr. Poret's 2019 survey. The Court concludes from its *de novo* review that Mr. Klein's 2014 testimony about his survey is quite relevant and entitled to significant weight. The Court concludes from its *de novo* review that Mr. Ross, Mr. Mallory and Mr. Bertrand were credible witnesses and their testimony was not contradicted and is entitled to substantial weight. The Court concludes from its *de novo* review that Mr. Plourde did not present new evidence on any disputed fact, and that any additional details added to his 2014 and 2016 TTAB testimony add nothing substantive. From its *de novo* review, the Court

determines that Mr. Dauber did not present new evidence on any disputed fact and that any details he added to ITW's TTAB evidence add nothing substantive. Taking these credibility findings into account, and considering the record as a whole, the Court agrees with the TTAB that the three trademarks are functional. Reviewing the record *de novo*, the Court concludes there are no functionally equivalent designs available to Poly-America. Reviewing the record *de novo*, the Court concludes that the design results in a method which is either the same cost or negligibly more expensive for a feature which is critical to Poly-America's ability to meet its major retail customers' requirements. From its *de novo* review, the Court concludes there are advertising materials in which the originator of the design touted the design's utilitarian advantage. The Court agrees with the TTAB about the lack of merit to the convenient change of heart story. To the extent the Court has not made specific reference to a witness or evidence, the Court considered the witness and evidence, but did not find it merited discussion.

### M. ITW Abandoned of the '120 Registration through its Course of Conduct

96.     Having found that all three of the ITW Registrations are functional and should be cancelled on that ground, the TTAB declined to reach Poly-America's alternate ground for cancellation of the '120 Registration, i.e. abandonment. The Court has reviewed the evidence of record relating to Poly-America's abandonment claim and concludes that ITW has indeed abandoned the '120 Registration through its course of conduct. FOF ¶¶ 161-181.

97.     A mark shall be deemed to be 'abandoned' ... (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark . . . to lose its significance as a mark." 15 U.S.C. § 1127. Generally, when a company sells to third parties for re-sale under the third parties' marks rather than under the manufacturer's mark, that circumstance cripples any attempt to show that consumers uniquely associate the mark with one source, *i.e.*, the manufacturer. *See British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197,

1203 (TTAB 1993) (when "party has sold its own goods, bearing a color which it asserts has become distinctive of its goods, to third parties for resale to the consuming public **as the products of those third parties**," that practice detracts from a claim of distinctiveness) (emphasis added), *aff'd* 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1999); *Edward Weck Inc. v. IM Inc.*, 17 USPQ2d 1142, 1145 (TTAB 1990) (third parties selling as their own some of party's instruments detracts from the alleged distinctiveness of the party's claimed trademark). *See also Quaker State Oil Ref.'g Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 1299 (CCPA 1972); *Mine Safety Appliances* Co. *v. Elec. Storage Battery* Co., 405 F.2d 901, 903-904 (CCPA 1969).Having found that all three of the ITW Registrations are functional and should be cancelled on that ground, the TTAB declined to reach Poly-America's alternate ground for cancellation of the '120 Registration, *i.e.* abandonment. The Court has reviewed the evidence of record relating to Poly-America's abandonment claim and concludes that ITW has indeed abandoned the '120 Registration through its course of conduct.

98.     Under the statute, it is the totality of ITW's action and inaction over the years that the Court must consider. The following acts and omissions committed by ITW over many years are more than sufficient to demonstrate that ITW abandoned the '120 Registration.

99.     ITW admittedly has "licensed" its marks to multiple, unrelated parties that are competitors in the manufacture and sale of reclosable consumer storage bags. Competitors using various forms of colored closures include national brands (such as ZIPLOC and GLAD) and private-label brands. These competitors often sell their respective products side-by-side in the marketplace under their own brand names (both national brands and private-label brands). *See British Seagull*, 28 USPQ2d at 1203; *Edward Weck Inc.*, 17 USPQ2d at 1145.     These competitors also control the advertising and promotion of their respective products. There is no

competent evidence that consumers understand or believe that these competing "licensed" products, sold under multiple brand names and by different companies, emanate from a single source. .

100.    ITW's judicial admissions and the evidence presented at trial demonstrates that ITW's indiscriminate licensing practices continue to the present.  FOF ¶¶ 179-181.

101.    ITW allowed Glad to manufacture and sell reclosable bags, under the GLAD brand, with the "yellow and blue makes green" zipper closure without benefit of a license from, or any control by, ITW.  ITW did so despite its subsequent position that, absent a license, the Glad color-change zipper closure infringed ITW's so-called Color Line trademark.  During that unlicensed period, these GLAD brand products became a major national brand, associated with Glad (not ITW).  During that time, Glad applied for and obtained registration of its product packaging design featuring its "yellow and blue makes green" zipper closure.  One of the packaging specimens submitted by Glad even displayed the statement:  "When you see the green seal you know the bag is closed!"

102.    Not until ITW itself wanted to manufacture and sell private-label products for the consumer market, and compete in the same market in which Glad and its colored closure bags were already well established, did ITW take steps to challenge Glad's alleged infringement.

103.    In addition, the Settlement Agreement that ultimately resolved an infringement dispute between ITW and Glad actually undermines any claim by ITW that its "Color Line" trademarks serve as a single source identifier.  To the contrary, ITW's settlement with Glad accomplished the following, all to the detriment of any claim of distinctiveness of the product configuration that is the subject of the '120 Registration:

(a)    the agreement prohibited ITW's ability to use certain colors in its closures;

(b)      the agreement allowed Glad to obtain its own product configuration trademark for a reclosable bag with a color closure that, to this day, ITW claims is covered by the '120 Registration despite Glad's own, separate registration for that mark;

(c)      the agreement allowed Glad to continue the manufacture and distribution of its products as associated with the GLAD brand (not with ITW);

(d)      the agreement did not assign to ITW any goodwill Glad may have acquired in its "yellow and blue makes green" seal products prior to its agreement with ITW; and

(f)      the agreement did not provide ITW with any meaningful ability to exercise control over Glad's allegedly licensed products.

DTX-112 (Dkt. 29-14; ITW TTAB Tr. Ex. 17).

104.      ITW's act of allowing Glad to obtain its own registration for a mark that falls within the scope of ITW's '120, '114, and '243 Registrations is wholly inconsistent with ITW's claims of ownership.  Glad's registration is premised on **Glad's sales** of the very same reclosable bag products – **under the GLAD brand** – that ITW claims also are licensed under and covered by the challenged ITW's marks.  Yet, pursuant to Section 1(a)(1) of the Trademark Act, 15 U.S.C. 1051(a)(1), only "[t]he owner of a trademark used in commerce may request registration of its trademark...." *In re Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986) (Nies, C.J. concurring) ("Under section 1 of the Lanham Act, only the *owner* of a mark is entitled to apply for registration.")(emphasis in original*); Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 n.6, 189 USPQ 630, 635 n.6 (CCPA 1976) ("One must be the owner of a mark before it can be registered.");  *In re Deister Concentrator Co. Inc.*, 289 F.2d 496, 501 (CCPA 1961) ("Under section 1, only 'The owner of a trademark' can apply for registration.").  Simply put, ITW cannot

fairly claim to own rights in very same mark that, by agreeing to Glad's registration, it has conceded it does not.

105.    Finally, although other (non-Glad) ITW licenses do contain quality control provisions, ITW has adduced scant, if any, evidence that it actually exercised its quality control rights until after Poly-America filed its Petition for Cancellation in 2013.   ITW has adduced no competent evidence even suggesting that it made any efforts whatsoever to actually monitor the quality of "licensed" products for the better part of the first 40 years after '120 Registration issued.

106.    The Court concludes that ITW's numerous acts or omissions inescapably deprive the product configuration that is the subject of the '120 Registration of the ability to serve as a source identifier.   Accordingly, in addition being cancelled on the ground of functionality, the '120 Registration also warrants cancellation on Poly-America's alternate ground of abandonment.

### III.
### CONCLUSION

For all of the foregoing reasons, the Court **AFFIRMS** the TTAB Decision cancelling the three challenged ITW Registrations.   Judgment shall be entered in favor of Poly-America. Illinois Tools Work Inc. shall bear all costs of court.

IT IS SO ORDERED.

Signed this _26_ day of September, 2019.

<br>

SAM R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE